[960 NE2d 430, 936 NYS2d 661]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GERALDO CRUZ, Appellant.

Argued October 20, 2011; decided November 22, 2011

### APPEARANCES OF COUNSEL

*Legal Aid Society, Appeals Bureau*, Riverhead (*Kirk R. Brandt* and *Robert C. Mitchell* of counsel), for appellant.

*Thomas J. Spota, District Attorney*, Riverhead (*Glenn D. Green* and *Michael Brennan* of counsel), for respondent.

### OPINION OF THE COURT

MEMORANDUM.

The order of the Appellate Division should be reversed and a new trial ordered.

Naomi Edwards encountered an intruder in the kitchen of her home in Brentwood, Suffolk County, on the afternoon of January 3, 2007. The man appeared to her to be "Puerto Rican or . . . light skinned African American." He pulled a baseball cap down over his face and ran out of her house.

Edwards's neighbor, Raquel Oliveria, had seen a man on a light blue 10-speed bicycle riding slowly back and forth on the street, before entering Edwards's driveway. He was wearing a black shirt, blue jeans, and a black hat. The man parked his bicycle in the driveway, and looked around. He attempted to open two windows at Edwards's house. Oliveria lost sight of the man when he walked to the side of Edwards's house where the kitchen door was located. A few minutes later, Oliveria saw the man as he fled the house. He retrieved his bicycle and pedaled away.

Edwards and Oliveria called 911. Police Officer Charles Ross was dispatched to look for a Hispanic male, riding a blue bicycle, and possibly wearing a black shirt and black hat. Within about three minutes, Ross saw a man fitting that description, on a blue, 10-speed bicycle, at an intersection about a quarter of a mile from Edwards's house. The man, defendant Geraldo Cruz, said he was on his way to a friend's house.

Subsequently, Police Officer Sean Petersen interviewed Edwards and Oliveria. Officer Petersen asked Oliveria to

accompany him to view the suspect. At the "showup," Oliveria identified Cruz as the man she had seen trying to break into her neighbor's house. However, she did so, not by recognizing his face, but on the basis of the clothes he was wearing and the bicycle he was riding.

Cruz was arrested and held in prison on a parole violation. While incarcerated, he wrote three letters to Edwards, "asking her to please come to court" to identify him. Cruz was charged with burglary in the second degree and, on the basis of the letters, three counts of tampering with a witness in the fourth degree. The witness tampering charges were later dismissed pursuant to the People's application.

County Court held *Wade* and *Sandoval* hearings. At the latter, it emerged that Cruz had four felony and four misdemeanor convictions. The record contains no evidence that Cruz behaved disruptively during the hearings.

Jury selection began in County Court on February 14, 2008. At voir dire, defense counsel, finding Cruz in "leg shackles," asked for the basis for restraining his client. County Court gave no immediate explanation, but noted that a curtain of opaque bunting had been placed around the defense table to conceal the restraints. The jury, County Court opined, would "never know anything about the shackles." Defense counsel strenuously objected, arguing that the jury would infer from the presence of the curtain around the defense table but not the prosecution table that Cruz was shackled.

Subsequently, County Court made the following remarks, regarding Cruz's shackles:

> "[Cruz] is no stranger to the criminal justice system. He has been a threat before to society. Also, my concern is that it's been explained to him should he not prevail on this matter he's looking at a long, long time. . . . His motive to destroy the trial or to take vengeance upon anybody who testifies or just to disrupt the proceedings, based upon . . . the potential for what he's looking at might be an incentive."

County Court also stated that the incidence of "problems" in courtrooms had "risen dramatically over the last few years." Finally, the judge mentioned that Cruz was not being "singled out," adding that shackling had been his "policy . . . with numerous cases."

The next day, County Court added the following statement about the shackling: "[S]o the record is clear, . . . the shackling

. . . was not my independent determination. It was recommended to me by the security staff." County Court then denied defense counsel's request for a hearing on the matter.

During his trial, Cruz was made to wear shackles on his ankles. Bunting was draped around the defense table, but not the prosecution table. The restraints were removed before Cruz was escorted by court officers to the witness stand to testify.

Oliveria and Edwards testified at the trial. The jury heard testimony concerning Oliveria's showup identification of Cruz. Edwards identified Cruz's hat and shirt as those the intruder had worn. For his part, Cruz testified that the bicycle he was riding when arrested was not his own; seeing the bicycle lying abandoned on the street, he had taken it a few moments before the police stopped him.

The jury found Cruz guilty of burglary in the second degree. Following his conviction, Cruz appealed, arguing, among other things, that the shackling violated his constitutional rights. The Appellate Division affirmed County Court's judgment of conviction (79 AD3d 1145 [2010]). A Judge of this Court granted Cruz leave to appeal, and we now reverse.

Federal constitutional law "prohibits the use of physical restraints visible to the jury during a criminal trial, absent a court determination that they are justified by an essential state interest specific to the defendant on trial" (*People v Clyde*, 18 NY3d 145, 152 [2011] [decided today] [internal quotation marks and ellipsis omitted], quoting *Deck v Missouri*, 544 US 622, 624 [2005]). "Trial courts may not shackle defendants routinely, but only if there is a particular reason to do so" (*Deck*, 544 US at 627).

On the record before us, we cannot conclude that the shackles were not visible to the jury, or that the jury, seeing the bunting around the defense table and not the prosecutor's, would not have inferred that it was there to hide shackles on Cruz's legs. Moreover, County Court did not place on the record any findings, particular to Cruz, justifying the use of leg irons. The reasons given by County Court would apply to most repeat offenders, and, in its final statement on the matter, County Court conceded that it had not reached its own "independent determination" as to the necessity of shackles. Consequently, the use of

leg irons was a violation of Cruz's constitutional rights under *Deck*.*

Harmless error analysis is applicable to a violation of *Deck* (*see People v Clyde*, 18 NY3d 145 [2011] [decided today]). Here, the People concede that the evidence against Cruz was not overwhelming, so that they cannot meet their burden of showing that any constitutional error was harmless beyond a reasonable doubt.

Chief Judge LIPPMAN (concurring as to the result). *Deck v Missouri* (544 US 622 [2005]) addresses what the Constitution requires to rectify the due process violation occurring "where a [trial] court, without adequate justification, orders the defendant to wear shackles *that will be seen by the jury*" (*id.* at 635 [emphasis supplied]). In contrast to *Deck* (*see id.* at 634), there is no indication that the leg irons defendant Cruz was forced to wear during his trial were, in fact, visible to the jury and I do not believe that this case comes within *Deck*'s analytical framework by reason of the circumstance that there may exist some residual, unnegated possibility that defendant's shackles were seen or that their existence was inferred (*see* majority mem at 944-945). Thus, while it is clear that *People v Clyde* (18 NY3d 145 [2011] [decided today]), involving the visible, indeed blatant, use of shackles without record justification, was necessarily decided in accordance with *Deck*, it is not similarly clear that the analytic course charted in *Deck* must be followed here. The question posed on this appeal—one that did not have to be addressed in *Clyde*—is what the appellate response should be when a criminal defendant has, without adequate record justification, been forced to wear a physical restraint during trial, but there is absent from the record any indication that the restraint was actually perceived by the jury. This is an inquiry to which I believe we have already spoken as a matter of state law in *People v Buchanan* (13 NY3d 1, 4 [2009]).

In *Buchanan*, as here, there was no indication that the jury had become aware of the restraint, a stun belt, which was concealed by Buchanan's outer clothes. And, the People argued as they do here that "*Deck* is distinguishable because the stun belt here was not visible to the jury" (*Buchanan*, 13 NY3d at 4). We

---

* Contrary to the concurrence, *People v Buchanan* (13 NY3d 1 [2009]) is not applicable here. A stun belt has a known potential for extremely painful and humiliating physical effects, which may hinder a defendant's communications with counsel and participation in his defense. The same is not true of leg irons.

replied that it was not necessary to decide whether there had been a constitutional due process violation since "as a matter of New York law . . . it is unacceptable to make a stun belt a routine adjunct of every murder trial, without a specifically identified security reason" (*Buchanan*, 13 NY3d at 4). While shackles are different from stun belts, the principal underlying rationale for requiring judicial justification for restraining a defendant at trial is the same. A defendant is presumed innocent and must be treated by the State, to the extent possible, in a way that is consonant with that presumption. As we said in *People v Roman*, "[a] defendant is presumed innocent and he is entitled to appear in court with the dignity and the self-respect of a free and innocent man" (35 NY2d 978, 979 [1975]). If a stun belt may not, under New York law, be a routine adjunct of a murder trial, neither may shackles be a routine adjunct of a trial for burglary.

We did not engage in harmless error analysis in *Buchanan*, but rather reversed, apparently, solely by reason of the error in requiring the restraint without case specific record justification. While we did not explain this summary approach, there is much to recommend it.

Although the mere hypothesis that an unjustified shackling has affected a verdict—and that is all there is here—is not enough to sustain a *Deck* analysis, since the essential premise of requiring the People to prove beyond a reasonable doubt that the shackling did not contribute to the verdict is that there has been prejudice from the jury's actual perception of the defendant in restraints, the concern that seems to underlie the Court's expansion of *Deck*'s applicability is entirely justified. The introduction of a physical restraint into a criminal trial unavoidably risks its discovery, either through mischance or because the elaborate measures taken to keep the restraint from the jury's awareness will themselves disclose to the jury that there is something about the defendant's appearance that is being kept from them; as the Court has noted, the misgivings of defendant's attorney as to the efficacy of the bunting used to shield the shackles from the jury's eyes—particularly when it was used only at the defense table—were not misplaced. These risks to the fairness of the proceeding are not ones that should be routinely undertaken. Nor should other likely consequences of employing restraining devices on a defendant at trial—the burdening of representational rights and the right to be present at all material stages of the trial and, indeed, to testify in one's behalf—be minimized, even though the manner in which they

affect a verdict may be indirect and exceedingly difficult to account for accurately in a harmless error analysis. For these reasons it would seem prudent to attach a definite consequence to a trial court's failure to make the findings essential to justify the use of physical restraints—a consequence that does not depend upon the limitations and vagaries of harmless error analysis. That is what we did in *Buchanan*. Given the very basic interests at stake, and the ease with which they can properly be afforded the judicial consideration they are due, there should be a clear rule that the failure to make a record to justify restraining a defendant at trial will necessitate a new trial. We observed in *Buchanan* that "a trial court has broad discretion in deciding whether a restraint is necessary for courtroom security" (13 NY3d at 4) and that a formal inquiry was not required so long as the requisite record was made. This is not an onerous condition of a decidedly onerous imposition. There is no reason why it should not be met.

Judges GRAFFEO, READ, SMITH and PIGOTT concur in memorandum; Chief Judge LIPPMAN concurs in result in an opinion in which Judges CIPARICK and JONES concur.

Order reversed, etc.