[961 NE2d 634, 938 NYS2d 243]

The People of the State of New York, Appellant, v Raymond Clyde, Respondent.

Argued October 20, 2011; decided November 22, 2011

146

## POINTS OF COUNSEL

*Jon E. Budelmann, District Attorney*, Auburn (*Christopher T. Valdina* of counsel), for appellant. I. The overwhelming evidence of defendant's guilt renders the shackling error harmless. (*Deck v Missouri*, 544 US 622; *People v Rouse*, 79 NY2d 934; *People v Buchanan*, 13 NY3d 1; *Chapman v California*, 386 US 18; *People v Crimmins*, 36 NY2d 230; *People v Hamlin*, 71 NY2d 750; *People v Bayard*, 15 NY3d 896; *People v Wardlaw*, 6 NY3d 556; *People v Jacobs*, 6 NY3d 188; *People v Douglas*, 4 NY3d 777.) II. The overwhelming evidence of defendant's guilt renders harmless the insignificant errors in the prosecutor's questioning of the two physician-witnesses. (*People v Kello*, 96 NY2d 740; *People v Forcione*, 156 AD2d 952, 75 NY2d 919; *People v Cronin*, 60 NY2d 430; *People v Crimmins*, 36 NY2d 230; *People v McMillion*, 181 AD2d 997, 80 NY2d 835.) III. The uncontested trial evidence, viewed in the light most favorable to the People, was legally sufficient to support the jury's verdict finding defendant guilty of attempted rape in the first degree. (*People v Contes*, 60 NY2d 620; *Jackson v Virginia*, 443 US 307; *People v*

*Glover,* 66 NY2d 931; *People v Coleman,* 74 NY2d 381; *People v Bracey,* 48 AD2d 860, 41 NY2d 296; *People v Naradzay,* 11 NY3d 460; *People v Mahboubian,* 74 NY2d 174; *People v McDade,* 14 NY3d 760; *People v Cano,* 12 NY3d 876; *People v Bleakley,* 69 NY2d 490.)

*David P. Elkovitch,* Auburn, for respondent. I. The pro se defendant was denied a right to a fair trial by keeping him shackled in leg irons for the jury to see and hear from jury selection to verdict. (*Matter of State of New York v Rashid,* 16 NY3d 1; *Matter of Seitelman v Lavine,* 36 NY2d 165; *People v Crimmins,* 36 NY2d 230; *People v Roman,* 35 NY2d 978; *People v Jenkins,* 88 NY2d 948; *Estelle v Williams,* 425 US 501; *People v Buchanan,* 13 NY3d 1; *People v Mees,* 47 NY2d 997; *People ex rel. Battista v Christian,* 249 NY 314; *People v Britt,* 43 NY2d 111.) II. The trial court allowed two expert witnesses to usurp the function of the jury. (*People v Grutz,* 212 NY 72; *People v Negron,* 280 AD2d 557; *People v Forcione,* 156 AD2d 952.) III. The trial court did not abuse its discretion granting defendant's motion to dismiss with regard to rape. (*People v Glover,* 66 NY2d 931; *People v Naradzay,* 11 NY3d 460; *People v Warren,* 66 NY2d 831; *People v Sullivan,* 173 NY 122; *People v Werblow,* 241 NY 55.)

*Mintz & Oppenheim LLP,* New York City (*Marshall A. Mintz* of counsel), and *Green & Willstatter,* White Plains (*Richard D. Willstatter* of counsel), for New York State Association of Criminal Defense Lawyers, amicus curiae. The Appellate Division majority was correct that reversal was required where the trial court made no findings as to why defendant should be shackled and failed to give any curative instruction to the jury. (*Deck v Missouri,* 544 US 622; *Holbrook v Flynn,* 475 US 560; *Illinois v Allen,* 397 US 337; *People v Crimmins,* 36 NY2d 230; *People v Dawson,* 125 AD2d 860; *People v Mattison,* 97 AD2d 621; *People v Vivenzio,* 103 AD2d 1044; *People v Harper,* 47 NY2d 857; *People v Hilliard,* 73 NY2d 584; *Kennedy v Cardwell,* 487 F2d 101.)

### OPINION OF THE COURT

Pigott, J.

We hold that harmless error analysis is applicable when a trial court has ordered the use of visible shackles without adequate justification articulated on the record (*see Deck v Missouri,* 544 US 622 [2005]). Here, defendant's shackling during trial was harmless, as was an evidentiary error committed by

the trial court. We also agree with the People that the count of defendant's indictment charging him with attempted rape should not have been dismissed.

## I.

A female, civilian employee of Auburn Correctional Facility was attacked in the prison on the afternoon of July 7, 2006. She was walking along an otherwise empty corridor, towards the south mess hall kitchen when a man attacked her from behind, putting his hand over her mouth and nose. The employee, managing to get free of her attacker's grasp momentarily, begged him not to hurt her, and asked, "What do you want?" The man did not answer. He slammed the woman against a wall, and thrust a sock or towel into her mouth. After she succeeded in getting the object out of her mouth, and screamed for help, the assailant threatened to kill her if she did not keep quiet, placed the same object into her mouth again, and pushed her onto her knees.

Remaining behind the employee at all times, so that she could not see him, the man pulled her head back by her hair, while continuing to push the sock or towel into her throat. He then pushed her to the floor. When the sock or towel fell out again, the man replaced it, shouted profanities, and punched the employee in the face. The assailant demanded her hands, and started wrapping a cord around one hand. The employee refused to yield her other arm, and bit one of the man's hands, experiencing a sensation that made her think he was wearing gloves. The attacker, straddling the employee as she lay on her stomach, got both her hands behind her back.

It was at this point that another civilian employee of the prison, Anthony Rebich, who had heard his coworker's cries, came to her rescue. He saw his colleague lying on the floor of the corridor struggling with an inmate who was trying to tie her hands with white strips of cloth. Rebich activated an alarm and yelled at the inmate who started running towards him. Rebich tripped the inmate, and the two men exchanged blows. Rebich chased the inmate along the corridor, but the inmate ran out of the building. Going to the aid of the female employee, Rebich and another colleague found her screaming for help and repeating that the man had tried to rape her.

Corrections Officer John Exner found defendant Raymond Clyde in the yard, in the vicinity of the south mess hall. He was sweating profusely, was acting nervously, and gave an

explanation for his presence in the yard that made no sense to the officer. Rebich identified Clyde as the man he had encountered in the corridor. The female employee who had been attacked was unable to identify her assailant.

Clyde's DNA was found on a sock, a towel, and a glove, left behind when the attacker fled the corridor. The DNA samples on the towel and glove came from semen-stained areas of those items. Semen was also found on the female victim's T-shirt, but was insufficient for identification purposes. A tape roll and a strip of cloth left at the crime scene matched a tape roll spindle and a torn bed sheet found in Clyde's single-occupancy cell.

The female employee had numerous facial lacerations, abrasions, and bruises, and a deep oral laceration. She told the nurse who treated her at the prison infirmary that an inmate had tried to rape her. She was treated at Auburn Memorial Hospital, and released. Rebich was treated at the same hospital, and was diagnosed with a concussion.

## II.

Clyde was indicted on charges of attempted rape in the first degree, assault in the second degree (two counts), unlawful imprisonment in the first degree, and promoting prison contraband in the first degree. Defense counsel sought an order from County Court directing that Clyde be permitted to appear in court without prison garb, chains or shackles. The People, while not opposing this request, produced a report of Clyde's criminal history, showing that he was serving a prison sentence of 25 to 50 years, following a 1996 conviction for rape in the first degree (two counts), sodomy in the first degree, robbery in the first degree, and burglary in the first degree. The People also pointed to Clyde's earlier convictions and to a history of over 20 disciplinary findings during his present incarceration.

When Clyde's trial began in December 2007, County Court agreed that Clyde could wear noninstitutional clothes and need not wear handcuffs, but insisted that he wear leg irons. The trial court offered to have a "curtain" draped around the defense table to conceal the leg irons. After some discussion with Clyde about the practical difficulties of such an arrangement, which would not allow Clyde to attend sidebar conferences without revealing the leg irons, Clyde agreed to forgo the curtain. At no point did County Court place on the record its findings showing that Clyde needed restraint by means of leg irons.

Clyde waived his right to counsel. Properly warned of the risks of self-representation, Clyde proceeded pro se throughout jury selection and his trial.* Clyde did not raise the subject of his shackles again, and sought no cautionary instruction in that regard.

In all, 29 witnesses testified at Clyde's trial, including, among others, the female victim, Rebich, Exner, and the forensic scientists who had performed the DNA analysis. Sergeant Craig Diego testified that on the day before the attack, and twice on the morning of the attack, he had seen Clyde in a prison alleyway that he was not authorized to remain in, which was frequented by "teachers . . . go[ing] down to the [prison] school, [and] any civilians going down to the shops." He had twice admonished Clyde, for being in the alleyway.

On cross-examination of the female victim, Clyde brought out that the assailant had not put his hands under her clothes, or touched her "private parts." No evidence was presented to show that the assailant had disrobed.

In relation to the injuries suffered by Rebich, the prosecutor asked Dr. Mervyn Whelan, an emergency staff physician at Auburn Memorial, who had treated him, whether Rebich's injuries met the definition of "physical injury," namely "substantial pain or limitation of physical condition." Clyde objected that this was a determination to be made by the jury. County Court overruled the objection, and Whelan testified that, in his opinion, Rebich had suffered a physical injury. Similarly, the prosecutor asked Dr. Barbara J. Connor, also an emergency staff physician at Auburn Memorial, who had treated the female employee, whether her injuries satisfied the same definition of "physical injury" and whether the attack had created a "risk of serious physical injury," defined as physical injury that "creates a substantial risk of death." Connor answered these questions in the affirmative, again over Clyde's objection.

At the close of the People's case, Clyde, who called no witnesses, moved for a trial order of dismissal. County Court reserved decision. The jury found Clyde guilty on all counts. County Court granted Clyde's motion with respect to the charge of attempted first-degree rape, dismissing that count of the indictment, but denied the motion in all other respects.

---

* Clyde's defense counsel was present in a standby capacity.

Following his conviction, Clyde appealed, arguing that County Court had failed to articulate a reasonable basis on the record for its determination to restrain him in shackles during the trial. The People appealed County Court's order dismissing the charge of attempted first-degree rape. The Appellate Division reversed County Court's judgment of conviction, ruling that the use of shackles was reversible error, and further held that the trial court had properly dismissed the attempted rape charge (72 AD3d 1538 [2010]). One Justice dissented, and granted the People leave to appeal. We now reverse.

### III.

In *Deck v Missouri* (544 US 622 [2005]), the United States Supreme Court, surveying law from Blackstone to the present day, held that the Federal Constitution prohibits the use of physical restraints visible to the jury during a criminal trial, absent a court determination that they are "justified by an essential state interest . . . specific to the defendant on trial" (*id.* at 624 [internal quotation marks omitted]). Such essential state interests include "physical security, escape prevention, [and] courtroom decorum" (*id.* at 628). The trial court must exercise "close judicial scrutiny" (*Holbrook v Flynn*, 475 US 560, 568 [1986], quoting *Estelle v Williams*, 425 US 501, 504 [1976]), in determining whether such an interest requires shackling.

The Court enunciated three fundamental legal principles that underlie this well-grounded holding: the presumption of innocence, securing a meaningful defense, and maintaining dignified proceedings (*see Deck*, 544 US at 630-632). The Court concluded that visible shackles may not be used unless justified by an individualized security determination conducted by the trial court, which "must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial" (*id.* at 633). The Supreme Court made it clear that, to avoid committing error, a trial court requiring a defendant to be visibly shackled should place its individualized findings *on the record* (*see id.* at 633-634; *see also id.* at 640-641, 643, 649 [Thomas and Scalia, JJ., dissenting]).

Finally, the Supreme Court clarified that

"where a court, without adequate justification, orders the defendant to wear shackles that will be

seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained' " (*id.* at 635, quoting *Chapman v California*, 386 US 18, 24 [1967]).

Here, County Court did not place on the record its reasons for considering leg irons necessary during Clyde's trial. Clyde's history would have supported a decision to require shackles, but the trial court has to make that determination and articulate its reasons itself. We cannot tell from the record whether County Court shackled Clyde as a matter of routine because he had already been convicted of a violent crime, or whether the court engaged in case-specific reasoning that led to the conclusion that shackles were necessary. The use of leg irons was therefore a violation of Clyde's constitutional rights under *Deck*.

## IV.

■ The issue then becomes whether the trial court's error was harmless. Because we find that the trial court committed error as a matter of federal constitutional law, we apply Supreme Court precedent in deciding whether the error is of a type that may be harmless (*see Chapman*, 386 US at 20-21). In *Deck*, the Supreme Court declared that the burden is on the State to prove beyond a reasonable doubt that a shackling error "did not contribute to the verdict obtained" (544 US 622, 635 [internal quotation marks omitted], quoting *Chapman*, 386 US at 24). By quoting language from *Chapman*, a case that holds, as a matter of federal law, that federal "constitutional errors can be harmless" (*Hedgpeth v Pulido*, 555 US 57, 60 [2008]), the *Deck* Court made it clear that harmless error analysis applies to shackling errors.

Were we to decide this question under state constitutional law, the result would be the same. A defendant has the right to be free of visible shackles, unless there has been a case-specific, on-the-record finding of necessity. However, we would not hold, as a matter of state law, that an error in ordering shackles requires automatic reversal.

A constitutional error is "considered harmless when, in light of the totality of the evidence, there is no reasonable possibility that the error affected the jury's verdict" (*People v Douglas*, 4 NY3d 777, 779 [2005]). We take into account "two discrete

factors: (1) the quantum and nature of the evidence against defendant if the error is excised and (2) the causal effect the error may nevertheless have had on the jury" (*People v Hamlin*, 71 NY2d 750, 756 [1988]). We therefore must decide whether the proof of Clyde's guilt was overwhelming and whether there is no reasonable possibility that the jury would have acquitted him were it not for the shackling error.

With respect to the charges of which Clyde was convicted after County Court granted his motion to dismiss with respect to the attempted rape charge, the evidence was overwhelming. In particular, DNA evidence and Rebich's identification placed Clyde at the crime scene, and articles left behind by the perpetrator when he fled matched items in Clyde's single-occupancy cell. Moreover, we do not believe that there is a reasonable possibility that the jury would have acquitted Clyde had he not worn visible shackles at trial. A jury, faced with a defendant accused of assaulting and/or attempting to rape a civilian while incarcerated, is more likely to conclude that the defendant was shackled as a precaution, because of the nature of the crimes charged, than to conclude that the defendant was shackled because he was independently known to be dangerous.

## V.

■ Clyde also argues on appeal, as he did pro se at his trial, that the testifying physicians were improperly allowed to testify as to their conclusions regarding the female victim's and Rebich's injuries, in the context of statutory interpretation, because those conclusions were for the jury to draw. Here, "admissibility turns on whether, given the nature of the subject, the facts cannot be stated or described to the jury in such a manner as to enable them to form an accurate judgment thereon" (*People v Cronin*, 60 NY2d 430, 432-433 [1983] [internal quotation marks omitted]). The facts that underlie physical injury and risk of serious physical injury can readily be stated to a jury so as to enable the jurors to form an accurate judgment concerning the elements of assault and unlawful imprisonment. It was therefore error to overrule Clyde's objections and permit this expert testimony.

That said, nonconstitutional harmless error analysis applies to this error. The evidence that Clyde assaulted the female employee and Rebich, and unlawfully imprisoned the former, was overwhelming. Moreover, there is no significant probability that the jury's verdict on these counts would have been different had

it been required to draw its own conclusions with regard to the extent of the two victims' injuries. Consequently, the evidentiary error was harmless.

## VI.

Finally, we turn to the question whether the evidence of attempted rape was sufficient. "A verdict is legally sufficient when, viewing the facts in a light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (*People v Danielson*, 9 NY3d 342, 349 [2007] [internal quotation marks omitted], quoting *People v Acosta*, 80 NY2d 665, 672 [1993]).

The jury heard evidence that, before the attack, Clyde was seen lurking in an alleyway that civilian employees often walked along; that he attacked a female victim in an otherwise empty corridor; that he brought items that could be used to silence and restrain a person; that he tried to incapacitate his victim; that he spoke to his victim but did not ask her to help him escape from the prison or direct her to do anything other than be quiet; and that he forced his victim to the floor. The jury also heard evidence from which it could infer that Clyde ejaculated before he fled the scene. A jury could logically conclude that the People sustained its burden of proving that Clyde intended to rape.

We also believe that the evidence was sufficient to show that Clyde "came dangerously near commission of the completed crime" (*People v Kassebaum*, 95 NY2d 611, 618 [2001] [internal quotation marks omitted]). The jury heard that testimony that Clyde had straddled his gagged victim, and was in the process of binding her hands, when he was disturbed by Rebich's appearance in the corridor. A rational jury could have concluded that the attack was carried forward to a point that came within dangerous proximity to forcible sexual intercourse.

With respect to the attempted rape charge, therefore, Supreme Court erred in dismissing the count on sufficiency grounds. That was the only issue raised by the People's appeal to the Appellate Division from County Court's dismissal order, and it is the only issue we reach as to that count. Upon reversing the Appellate Division's affirmance of County Court's dismissal order, we remit the matter to County Court for sentencing on the conviction. Defendant then may take his own appeal to the Appellate Division, raising any issues available to him.

Accordingly, the order of the Appellate Division, reversing County Court's judgment, should be reversed, and the case remitted to the Appellate Division for consideration of the facts and issues raised but not determined on the appeal to that court from the judgment. The order of the Appellate Division, affirming County Court's order, should be reversed, and the case remitted to County Court for sentencing on the conviction of attempted rape in the first degree.

Chief Judge LIPPMAN (dissenting). It is not a novel principle that compelling a criminal defendant to appear before his or her jury in shackles without record, case specific justification, although a due process violation under the Fifth and Fourteenth Amendments to the United States Constitution, is not categorically barred from being proved harmless by the prosecution. *Deck v Missouri* (544 US 622 [2005]) recognizes the possibility that in hypothetically rare, extraordinarily overdetermined cases the prosecution may be able to "prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' *Chapman v. California*, 386 U.S. 18, 24 . . . (1967)" (*id.* at 635). The question now posed, then, is not what *Deck* in theory allows the prosecution to prove in order to save a conviction, but whether the prosecution here met its burden under *Deck* to demonstrate beyond a reasonable doubt that the unjustified visible shackling of this pro se defendant during his week-long jury trial—now conceded by all concerned to have been accomplished in violation of his right to due process—did not contribute to the verdict against him.

It is plain not only that no such demonstration was made, but that it was not possible given the verdict. Defendant was convicted of every count charged in the indictment. Although the evidence of some of the charged offenses was overwhelming, as the majority concedes, the evidence was not overwhelming as it bore upon the indictment's top count, charging attempted rape in the first degree. Even if one disagrees with the conclusion shared by the trial court and Appellate Division that the evidence in proof of that count was legally insufficient,[1] it is not

---

1. This conclusion, it seems to me, was correct. As the trial court observed in dismissing the attempted rape count, "[i]t is undisputed that there is no mention of sex or rape, that there [was at trial no evidence of] touching of any sexual part of the victim and that there is no attempt to remove any clothing or gain access beneath any clothing." The probative value of the DNA evidence is overstated by the majority. There was no proof as to when defendant's semen was deposited on the leather gloves and certainly no proof that

arguable that the count was, at best, marginally supported. In this evidentiary context, it is apparent that it would be impossible to prove beyond a reasonable doubt that the defendant's appearance before the jury constantly clad in officially provided implements subversive of the presumption of innocence as well as naturally and eloquently indicative of the wearer's antisocial propensities, could not have contributed to the verdict.

Were the Court not reinstating the attempted rape verdict, as it is, it would at least be possible to argue that the shackling error did not contribute to so much of the verdict that survived. But even that argument would not in the end be analytically sound because once it is admitted that the shackling error could have infected the deliberative process, it becomes virtually impossible to prove that it affected only isolated portions of the verdict. The relevant question it must be emphasized is not whether the shackling error itself caused the jury to return the verdict it did, i.e., whether but for the error defendant would have been acquitted, but whether there is any reasonable possibility that the error *contributed* to the verdict. The proof of noncontribution to which the People are put under *Deck* is quite simply impossible where, as here, the jury has convicted with respect to any count on evidence that is less than overwhelming.

While shackling errors are not, under *Deck*, categorically immune from harmless error analysis but merely, as a practical matter, extraordinarily difficult to prove harmless, some shackling errors, many of which in any event would be impossible to prove harmless under *Deck*, are I believe sheltered from harmless error analysis under our state jurisprudence. We have long recognized that

> "if in any instance, an appellate court concludes that there has been such error of a trial court, such misconduct of a prosecutor, such inadequacy of defense counsel, or such other wrong as to have operated to deny any individual defendant his fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial, quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction.

the deposits occurred during the charged assault. And, although there was testimony as to a "possibility" that there was a seminal fluid residue on the victim's tee shirt, there was, apart from the admittedly indeterminate nature of the residue, no evidence as to its source.

The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" (*People v Crimmins*, 36 NY2d 230, 238 [1975]).

"The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice" (*Estelle v Williams*, 425 US 501, 503 [1976]). Where, as here, shackles or other physical restraints imposed without adequate record justification are extensively viewed by the jury during trial and the jury is simply left to speculate upon their significance, the possibility of a fair trial becomes virtually irretrievable. The error involved, effectively depriving defendant of the presumption whose "enforcement lies at the foundation of the administration of our criminal law" (*Coffin v United States*, 156 US 432, 453 [1895]) was preclusive of a fair trial. While there are cases in which the brief and inadvertent exposure of a defendant in shackles to jurors will not necessarily have that consequence (*see e.g. People v Harper*, 47 NY2d 857 [1979]), here defendant, evidently with the Court's imprimatur, was during his entire week-long trial made to appear before his jury visibly restrained by implements commonly and nearly inevitably understood to be reserved for the management of dangerous and explosive individuals—persons presumptively predisposed to violent crime.[2] It is, or should be, clear that this appearance must have skewed the basic structure of the proceeding; the presumption of defendant's innocence and concomitant burden of the People to prove defendant's guilt beyond a reasonable doubt cannot reasonably be supposed to have survived. If, as *Crimmins* contemplates, there is a category of cases in which the fundamental, freestanding right to a fair trial must be vindicated even when there is overwhelming evidence favoring conviction, this case falls within it.

This trial was, practically speaking, hardly different from one conducted without a presumption of innocence charge or an instruction placing upon the People the burden of proving guilt beyond a reasonable doubt. When there is added to this the circumstance that the pro se defendant was literally hobbled as he exercised his Sixth Amendment right to plead his own case, it would seem clear beyond peradventure that what is at issue is

---

**2.** The majority is not wrong to say that the jury might have viewed the shackles as precautionary, but it is hard to understand how such a view would have been benign to defendant or his chances for a fair adjudication based on the fairly probative evidence.

error of a sort incompatible with the basic premises upon which trials are characterized as fair.

Accordingly, I would affirm the orders of the Appellate Division.

Judges GRAFFEO, READ and SMITH concur with Judge PIGOTT; Chief Judge LIPPMAN dissents and votes to affirm in a separate opinion in which Judges CIPARICK and JONES concur.

Order, reversing County Court's judgment, reversed, etc.