[964 NE2d 372, 941 NYS2d 1]

The People of the State of New York, Respondent, v Corey Gamble, Appellant.

Argued January 4, 2012; decided February 9, 2012

## POINTS OF COUNSEL

*Office of the Appellate Defender*, New York City (*Margaret E. Knight* and *Richard M. Greenberg* of counsel), for appellant. I. Where the trial court deferred to the court officers' stated policy of sitting in physical contact with Corey Gamble's chair, thereby preventing Mr. Gamble from having confidential communications with his attorney during the trial, and conveying to the jury that Mr. Gamble was dangerous and violent, he was denied his rights to counsel, due process, and a fair trial. (*People v Sloan*, 79 NY2d 386; *People v Turaine*, 78 NY2d 871; *People v Mehmedi*, 69 NY2d 759; *People v Ciaccio*, 47 NY2d 431; *People v Dokes*, 79 NY2d 656; *People v Cooper*, 307 NY 253; *Coplon v United States*, 191 F2d 749; *People v De Armas*, 106 AD2d 659; *People v Buchanan*, 13 NY3d 1; *Holbrook v Flynn*, 475 US 560.) II. Where the prosecution's case focused on Corey Gamble's motive, Mr. Gamble was denied his right to present a defense when the court precluded evidence that one of the victims was a drug dealer, had recently offered to be a criminal informant, and had once suffered a severe beating, unrelated to Mr. Gamble, inside the same apartment where the homicides occurred, demonstrating that other individuals also possessed a motive to harm one of the victims. (*Chambers v Mississippi*, 410 US 284; *Pointer v Texas*, 380 US 400; *People v Primo*, 96 NY2d 351; *People v Moore*, 42 NY2d 421; *People v Fitzgerald*, 156 NY 253; *People v Dyes*, 122 AD2d 69; *People v Rolf*, 185 AD2d 656; *People v Carver*, 183 AD2d 907; *People v LaFrance*, 182 AD2d 598; *People v Carter*, 86 AD2d 451.) III. The court abused its discretion by allowing the admission of an overwhelming quantity of evidence related to the history of disputes between Corey Gamble and the victims, and the prejudice from this error was only compounded when the prosecution and its witnesses exceeded the scope of the overly broad *Molineux* ruling. (*People v Molineux*, 168 NY 264; *People v Ventimiglia*, 52 NY2d 350; *People v Alvino*, 71

NY2d 233; *People v Bierenbaum*, 301 AD2d 119; *People v Giles*, 11 NY3d 495; *People v Dales*, 309 NY 97; *People v Resek*, 3 NY3d 385; *People v Mayrant*, 43 NY2d 236; *People v Richardson*, 222 NY 103; *Roldan v Artuz*, 78 F Supp 2d 260.) IV. In its closing argument, the prosecution impermissibly shifted the burden of proof by arguing that Corey Gamble should have called witnesses to corroborate his testimony. (*People v LaPorte*, 306 AD2d 93; *People v Walters*, 251 AD2d 433; *People v Tankleff*, 49 AD3d 160, 84 NY2d 992; *People v Gary*, 44 AD3d 416; *People v Antommarchi*, 80 NY2d 247; *United States v Parker*, 903 F2d 91; *People v Balls*, 69 NY2d 641; *People v Medina*, 53 NY2d 951; *People v Calabria*, 94 NY2d 519.)

*Corey Gamble*, appellant pro se. I. Respondent failed to dispute that their entire rebuttal case was premised upon irrelevant and incompetent evidence and counsel was ineffective for failing to raise an objection to have the testimony stricken. (*People v Gruden*, 42 NY2d 214; *Ohio v Roberts*, 448 US 56; *People v Ely*, 68 NY2d 520; *People v Baez*, 103 AD2d 746; *Hicks v Oklahoma*, 447 US 343; *People v Patterson*, 93 NY2d 80; *People v Vega*, 276 AD2d 414; *People v Clarke*, 66 AD3d 694; *People v De Jesus*, 42 NY2d 519; *Brookhart v Janis*, 384 US 1.) II. Respondent attempts to mislead this Court in its response to counsel's prejudicial failure to impeach Marvin Ford with his inculpatory prior inconsistent statement. (*People v Lewis*, 2 NY3d 224; *People v Lopez*, 56 AD3d 280; *People v Rojas*, 213 AD2d 56; *People v Garcia*, 46 AD3d 461; *People v Bryce*, 88 NY2d 124; *People v Vilardi*, 76 NY2d 67; *Ortega v City of New York*, 9 NY3d 69; *Kaufman v Quickway, Inc.*, 14 NY3d 907; *People v Nasser*, 15 Misc 3d 499; *People v Oxley*, 64 AD3d 1078.) III. Respondent has not disputed that the two cases are related; as such, defendant's right to counsel should have attached at the pretrial lineup. (*People v Gruden*, 42 NY2d 214; *People v Smith*, 54 NY2d 954; *People v Torres*, 60 NY2d 119; *People v Mitchell*, 2 NY3d 272; *People v Hawkins*, 55 NY2d 474; *People v Havelka*, 45 NY2d 636; *People v Payton*, 51 NY2d 169.)

*Robert T. Johnson, District Attorney*, Bronx (*Hannah E.C. Moore* and *Joseph N. Ferdenzi* of counsel), for respondent. I. The Appellate Division correctly found that the placement of the court officers has no impact on defendant's ability to communicate confidentially with his attorney; moreover, the placement of the court officers did not deprive defendant of a fair trial. (*People v Lane*, 7 NY3d 888; *People v Thomas*, 50 NY2d 467; *People v Konstantinides*, 14 NY3d 1; *People v Sloan*, 79

NY2d 386; *People v Vargas*, 88 NY2d 363; *Illinois v Allen*, 397 US 337; *People v Rouse*, 79 NY2d 934; *People v Palermo*, 32 NY2d 222; *People v Miller*, 184 AD2d 375; *People v Stokes*, 290 AD2d 71.) II. The Appellate Division properly found that defendant was not denied the right to present a defense. (*People v Primo*, 96 NY2d 351; *Greenfield v People*, 85 NY 75; *People v Carter*, 86 AD2d 451; *People v Hudy*, 73 NY2d 40; *Carmell v Texas*, 529 US 513; *Crane v Kentucky*, 476 US 683; *People v Arafet*, 13 NY3d 460; *People v Crimmins*, 36 NY2d 230; *People v Geraci*, 85 NY2d 359; *People v Wachowicz*, 22 NY2d 369.) III. The Appellate Division correctly found that the trial court's *Molineux/Ventimiglia* ruling was proper and that the prosecutor adhered to the scope of the ruling. (*People v Ingram*, 71 NY2d 474; *People v Alvino*, 71 NY2d 233; *People v Ventimiglia*, 52 NY2d 350; *People v Molineux*, 168 NY 264; *People v Jackson*, 39 NY2d 64; *People v Dorm*, 12 NY3d 16; *People v Tosca*, 98 NY2d 660; *People v Till*, 87 NY2d 835; *People v Yapor*, 308 AD2d 361; *People v Berry*, 278 AD2d 52.) IV. As the Appellate Division found, defendant's claim that the prosecutor's conduct during trial deprived him of a fair trial is unpreserved and without merit. (*People v Heide*, 84 NY2d 943; *People v Medina*, 53 NY2d 951; *People v Romero*, 7 NY3d 911; *People v Ashwal*, 39 NY2d 105; *Williams v Brooklyn El. R.R. Co.*, 126 NY 96; *People v Ortiz*, 116 AD2d 531; *People v Galloway*, 54 NY2d 396; *People v D'Alessandro*, 184 AD2d 114; *People v Calabria*, 94 NY2d 519; *People v Arce*, 42 NY2d 179.) V. The claims raised in defendant's pro se supplemental brief are without merit. (*People v Hawkins*, 55 NY2d 474; *People v Hernandez*, 70 NY2d 833; *People v Mitchell*, 2 NY3d 272; *People v Schreiner*, 77 NY2d 733; *People v Roe*, 74 NY2d 20; *People v Konstantinides*, 14 NY3d 1; *People v Molineux*, 168 NY 264; *People v Cohen*, 90 NY2d 632; *People v Baldi*, 54 NY2d 137; *People v Caban*, 5 NY3d 143.)

*Alan J. Pierce*, Syracuse, amicus curiae.

### OPINION OF THE COURT

CIPARICK, J.

This appeal raises several questions for our review. The principal question we are called upon to determine is whether courtroom seating arrangements wherein court officers stationed themselves directly behind defendant during the course of his trial deprived him of his constitutional right to communicate confidentially with his attorney and prejudicially conveyed to the jury that he was dangerous. We conclude that

the positioning of the court officers in this case did not infringe upon defendant's constitutional right to counsel or deprive him of a fair trial.

The other significant question we are asked to consider is whether Supreme Court abused its discretion when it permitted the People under *People v Molineux* (168 NY 264 [1901]) to introduce certain evidence of defendant's uncharged crimes and whether the People's evidence elicited at trial exceeded the scope of such ruling. We conclude that Supreme Court's decision to admit this evidence was appropriate.

## I.

A Bronx County grand jury charged defendant with three counts of murder in the first degree (Penal Law § 125.27 [1] [a] [viii]) and three counts of murder in the second degree (Penal Law § 125.25 [1]). The indictment alleged that on March 15, 2003, defendant killed Eunice Younger and her two adult children, Ricky Younger and Gloria Watson (the Youngers), by shooting them in the head inside their apartment. Prior to trial, defendant moved to suppress, as relevant here, his identification in a lineup by two eyewitnesses. Defendant contended that counsel represented him on a related matter and that, therefore, law enforcement violated his right to counsel when they conducted a lineup without notifying his attorney. Supreme Court denied the motion, reasoning that "[a] defendant who is not represented on a case for which he is in custody, but who is represented by an attorney on an unrelated case, has no right to the presence of that attorney at a lineup relating to the case in which he is not represented."

Also before trial, the People moved for the admission of certain uncharged crimes and prior bad acts allegedly committed by defendant, maintaining that the proffered testimony was relevant on the issues of "identity of the perpetrator, intent, motive and background." According to the People, their theory of the case was "that these homicides were the culmination of approximately a year long series of incidents between the defendant" and the Youngers, defendant's upstairs neighbors. In support of this theory, the People sought permission to elicit testimony from Cortina Watson, decedent Gloria Watson's daughter, and Marvin Ford, Gloria's boyfriend. The gravamen of the proposed testimony would be that defendant assaulted and threatened them and the Youngers on several occasions in the year prior to the shootings.

Following an initial hearing, written submissions by the parties and a subsequent reargument motion on the matter, Supreme Court limited Cortina Watson's testimony at trial as follows: on the evening of April 13, 2002, 11 months before the shootings, she was inside the Youngers' apartment with Ricky. At some time during Cortina's visit, defendant began kicking the door to the family apartment. Cortina answered the door at which time defendant, who was in an agitated state, told her that he was "sick and tired of you people using all the hot water." Cortina responded by informing defendant that no one in the apartment was utilizing the hot water. Defendant, in turn, threatened to kill her and Ricky. Fearing for their safety, they filed a complaint with the police and received a temporary order of protection forbidding defendant from having any contact with them.[1]

Supreme Court also allowed Marvin Ford to testify, limiting his testimony to the following: on January 18, 2003, less than two months before the shooting, Ford was inside the Youngers' apartment with Ricky. During Ford's visit, defendant came to the door and a verbal altercation between Ricky and defendant ensued. Ford overheard defendant threaten to kill Ricky and observed defendant display a knife. After defendant left the premises, Ford saw him from the apartment window. Defendant, again displaying what appeared to be a handgun, shouted to Ford that "I've got something for you." Based on this incident, the police arrested defendant and charged him with criminal contempt and a second order of protection was issued, barring defendant from having any contact with either Ford or Ricky.[2]

Toward the beginning of jury selection, defense counsel objected to the physical proximity of court officers who sat "directly behind the defendant." She complained that their positioning prevented her from freely communicating with her client and signaled to the prospective jurors that defendant had "to be guarded so closely." As such, counsel requested that the

---

**1.** Supreme Court precluded Cortina Watson from testifying that defendant had also threatened to kill Eunice Younger and her two children that evening. Supreme Court also prohibited Cortina from testifying that defendant displayed what appeared to be a handgun during the course of the incident.

**2.** Supreme Court precluded Ford from testifying about an incident that allegedly took place on March 14, 2003, the day before the shootings. On that day, Ford observed that decedent Gloria Watson's face was swollen and bruised. Watson told Ford that defendant had struck her in the face.

officers "sit at the rail where their seats are normally positioned." Supreme Court disagreed with defense counsel's perception, but informed her that it would ask the officers "to sit back a little further."

Later that day, defense counsel renewed her objection to the positioning of court officers behind defendant. She argued that, because the court officers have their feet on defendant's chair, "it is impossible to have a confidential communication with [him]." Supreme Court placed on the record that defendant had been charged with a disciplinary infraction while incarcerated at Rikers Island for allegedly assaulting a correction officer and that this incident was the basis for the heightened security measures—i.e., the placement of the court officers' toes against the bottom of defendant's chair. Supreme Court also indicated that there were prior incidents before a different judge where defendant acted aggressively in the courtroom. With respect to defense counsel's remarks concerning defendant's constitutional right to confidential communication with his attorney, Supreme Court noted that the court officers were only sitting approximately two or three inches closer to defendant from their normal position at the rail. The court further stated to counsel: "[T]he notion that there is a greater confidentiality in the communications between you when the officers are two inches further away I think is farfetched. You have as much confidentiality as you would have if they were back at the railing . . . so I don't see a difference there." In any event, Supreme Court offered to arrange opportunities for defendant and counsel to speak in a more private setting. Defense counsel also reiterated her view that the physical proximity of the court officers "has prejudiced the defendant terribly in the eyes of this jury because it telegraphs to them very directly this is a very dangerous man." Supreme Court rejected this argument, countering that it was "satisfied" that defendant was not prejudiced in the eyes of the jury.

After jury selection, the People presented comprehensive, albeit circumstantial, evidence linking defendant to the shootings. The jury, for example, heard testimony from Monica Killebrew who lived in an apartment opposite the Youngers. On the date of the shootings, at around 4:00 P.M., Killebrew was home when she heard loud banging noises coming from outside her apartment. As she approached her front door, Killebrew testified that the noises she heard sounded like "a fight," "like people . . . getting thrown up against the wall." A short time

thereafter, Killebrew heard defendant, whose voice she was positive that she recognized, say, "I am tired of you people bothering me." Immediately thereafter, Killebrew heard a "popping sound" that sounded like a gunshot. Moments later, she heard three more shots. At this point, Killebrew was standing by her apartment window in hysterics, speaking to a woman on the street, when she saw defendant walking out of the building. Killebrew testified that after defendant left, the apartment building was completely still inside and that nobody else entered or exited the building. Killebrew identified defendant in a lineup the following day and in court during the trial.

In addition to Killebrew, two other witnesses who were located at a business adjacent to the apartment building at the time of the shooting testified. They both corroborated Killebrew's testimony about the timing of the gunshots and identified defendant as the individual who exited the apartment building after the shots were heard. They also confirmed that nobody else entered or exited the building after defendant walked through the front entrance.

Once the police arrived, they discovered the Youngers in their apartment; all three had gunshot wounds to the head, and according to medical evidence, died instantly. During the police investigation, they recovered nine latent fingerprints, one of which conclusively proved to be a print of defendant's left ring finger.

As noted earlier, the People also elicited background testimony from Cortina Watson and Marvin Ford concerning defendant's contentious relationship with the Youngers. During Cortina's cross-examination, defense counsel asked her about an October 2001 incident in which Ricky Younger was the victim of a beating inside his apartment. The People objected to this question on relevance grounds. Defendant proffered that this beating was related to Ricky's involvement with illegal drug activity and that it was his intention to establish that Ricky had many enemies who had a motive to commit these murders. Supreme Court sustained the objection, reasoning that defense counsel failed to establish a connection between the October 2001 incident and the March 2003 shootings.[3]

---

**3.** During defense counsel's cross-examination of Killebrew, she asked whether Killebrew had used drugs with Ricky. After Supreme Court sustained the People's objection to the question, defense counsel renewed her argument that this evidence was relevant to show that Ricky had enemies with a motive

At the close of the People's proof, defendant elected to interpose a defense, testifying on his own behalf and calling numerous other witnesses. Defendant testified that, prior to the shootings, he had several disputes with the Youngers and Marvin Ford mainly because Ricky Younger had been selling drugs outside of defendant's apartment. Defendant explained that he called the police about once a month not only to complain about the drug selling but also about Ricky slashing the tires on his vehicle and excessive noise coming from the Youngers' apartment. Although defendant admitted that he had a verbal altercation with the Youngers on April 13, 2002, he disputed Cortina's version of the events. Defendant stated that the dispute on that day originated when he observed Ricky bending down near the side of his car with a knife. After defendant saw that his driver's side tire was flat, he confronted Ricky. Defendant denied that he threatened anyone or that he was in possession of a gun.

Defendant's version of the events that transpired on January 18, 2003 was also different. Defendant testified that at around 11:00 A.M. he left his apartment and noticed that Ricky and Ford stood near his car, drinking a beer. Defendant went back inside and when he returned to his vehicle approximately five minutes later, he observed that there was a broken bottle near his tire and that the tire was leaking air. Defendant explained that he went to the Youngers to confront both Ricky and Ford, but that he did not possess a knife or threaten to kill or stab Ricky. Defendant also maintained that he did not display a handgun to Ford.

With respect to the shootings, defendant denied that he was the perpetrator. In fact, defendant testified that on March 15, 2003, at around 5:00 P.M., he first learned of the shootings and that he was the suspect while watching a television news program at his mother's house. Defendant stated that he had left his apartment that day in the late morning and, before going to his mother's house, made a purchase at a RadioShack and filled out a job application at a Home Depot. Defendant also denied setting foot inside the Youngers' apartment and said that the fingerprint the police had recovered from a window frame therein could not be his.

The jury convicted defendant on one count of first-degree murder and one count of second-degree murder. Supreme Court

---

to kill him. Supreme Court adhered to its ruling, concluding that the proposed line of questioning was entirely speculative.

sentenced defendant to concurrent sentences of life imprisonment without parole and 25 years to life. The Appellate Division unanimously modified the judgment of conviction and sentence to the extent of vacating the DNA databank fee imposed by Supreme Court and, as so modified, affirmed (*see People v Gamble*, 72 AD3d 544, 545 [1st Dept 2010]). A Judge of this Court granted defendant leave to appeal (15 NY3d 920 [2010]) and we now affirm.

## II.

We begin our analysis with defendant's constitutional argument that the positioning of court officers directly behind him during the course of the trial deprived him of his right to communicate confidentially with his attorney. It is well settled that the fundamental right to counsel in a criminal case includes "the right to consult counsel in private, without fear or danger that the People, in a criminal prosecution, will have access to what has been said" (*People v Cooper*, 307 NY 253, 259 [1954]). "Intrusion upon a client-lawyer conference, whether in the privacy of an office or at the counsel table in court, contravenes our sense of traditional fair play and due process" (*id.*; *see also Coplon v United States*, 191 F2d 749, 759 [DC Cir 1951] [the Fifth and Sixth Amendments "guarantee to persons accused of crime the right privately to consult with counsel both before and during trial. This is a fundamental right which cannot be abridged, interfered with, or impinged upon in any manner"]).

In *Cooper*, we recognized that it is defendant's burden to establish that confidential communications with his attorney have been compromised (*see* 307 NY at 260). Here, we conclude that defendant did not meet his burden in showing that the positioning of the court officers directly behind him impeded his ability to converse privately with his attorney. Supreme Court found that the relief sought by defense counsel—a request that the court officers sit in their normal places two inches farther away from defendant—would not have made counsel's communications with defendant any more confidential, and nothing in the record suggests that the finding was incorrect.

Defendant also maintains that, in any event, the close positioning of the court officers directly behind him prejudiced him in the eyes of the jury in that it conveyed to them that he was dangerous. We reject this contention. It is axiomatic that "[t]rial courts must retain appropriate discretion to control their courtrooms and trial proceedings generally" (*People v*

*Vargas*, 88 NY2d 363, 377 [1996]). This discretion afforded to trial courts necessarily includes decisions pertaining to courtroom security. As the United States Supreme Court has held, "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country" (*Illinois v Allen*, 397 US 337, 343 [1970]). The Court further observed that "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations" (*id.*).

In this case, the record is clear that defendant had been charged with a disciplinary infraction for allegedly assaulting a correction officer at Rikers Island. Supreme Court placed this information on the record and further noted that defendant had acted aggressively in court during the pendency of this case before a different judge. We conclude that these record facts— never disputed by defendant—allowed the trial court in the exercise of its discretion to permit the court officers to sit directly behind defendant with their toes placed on the back of his chair. Nor is there a basis in the record for a finding that such security measure telegraphed to the jury that defendant was a dangerous individual. In that regard, we note that additional security measures sanctioned by Supreme Court were, at most, only minimally intrusive. At no point, for example, was defendant physically restrained in the presence of the jury (*see People v Clyde*, 18 NY3d 145, 152 [2011] ["the Federal Constitution prohibits the use of physical restraints visible to the jury during a criminal trial, absent a court determination that they are justified by an essential state interest specific to the defendant on trial"] [internal quotation marks, ellipses and citation omitted]). Simply put, defendant's assertion that the positioning of the court officers deprived him of a fair trial has no merit.

We now turn to the trial court's *Molineux* ruling, allowing certain uncharged crimes of defendant into evidence. We have long "held that there are instances when evidence of uncharged crimes may be used to prove guilt of the offense charged" (*People v Gillyard*, 13 NY3d 351, 355 [2009]). We articulated that such evidence may be admitted in circumstances

> " 'when [the evidence] tends to establish (1) motive;
> (2) intent; (3) the absence of mistake or accident;
> (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish others;

[or] (5) the identity of the person charged with the commission of the crime on trial' " (*id.*, quoting *People v Molineux*, 168 NY 264, 293 [1901]). We have repeatedly acknowledged that these categories are not exhaustive, but "merely illustrative" (*People v Jackson*, 39 NY2d 64, 68 [1976]). Thus, "we established the rule that evidence of defendant's other crimes is admissible only if probative of some fact at issue other than the defendant's criminal propensity" (*Gillyard*, 13 NY3d at 355, citing *People v Rojas*, 97 NY2d 32, 37-40 [2001]). Of course, "[t]he balancing of probative value against potential prejudice is entrusted to the trial court's discretion" (*Gillyard*, 13 NY3d at 355, citing *People v Ventimiglia*, 52 NY2d 350, 359-360 [1981]).

■ In our view, Supreme Court exercised sound discretion in permitting Cortina Watson and Marvin Ford to testify about limited incidents of defendant's uncharged crimes leading to the shootings. While excluding certain testimony that it deemed overly prejudicial, Supreme Court correctly determined that their testimony that defendant had previously threatened to kill them and Ricky Younger was relevant in establishing a motive for the murders and the identity of the perpetrator in this circumstantial evidence case (*see People v Dorm*, 12 NY3d 16, 19 [2009]). Moreover, the trial court properly opined that the testimony it allowed the People to elicit "provided necessary background information on the nature of the relationship [between defendant and the Youngers] and placed the charged conduct in context" (*id.*; *see e.g. People v O'Gara*, 239 AD2d 215, 215 [1st Dept 1997] ["Evidence of defendant's prior bad acts was properly received . . . which provided background information necessary to explain the increasingly acrimonious relationship between defendant and the victim . . . and which was necessary and highly relevant on the issues of motive and identity"]). Furthermore, our review of the record reveals that the People adhered to the scope of the trial court's *Molineux* ruling.

■ Defendant's further contention that he was denied the right to present a defense and his argument that Supreme Court erroneously shielded the jury from hearing evidence demonstrating that there were "other potential perpetrators who had a motive to do violence to Ricky" is without merit. Applying the standard articulated in *People v Primo* (96 NY2d 351, 356-357 [2001]), we agree with the lower courts that defendant failed to establish a nexus between an earlier beating where Ricky

Younger had been assaulted and the shooting here. Supreme Court's determination that this purported third-party culpability evidence would be entirely "speculative" and its subsequent preclusion was a proper exercise of its discretion. That the People introduced evidence establishing defendant's motive for the shootings does not, as the Appellate Division observed, "open the door to generalized, speculative evidence of possible motives by unidentifiable persons" (*Gamble*, 72 AD3d at 545).

Finally, contrary to defendant's assertion, the People did not shift the burden of proof at any point onto defendant to prove his innocence. Further, we have considered defendant's pro se contentions that his right to counsel attached during the viewing of the lineup and that he received ineffective assistance of counsel and find them to be without merit.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order affirmed.