=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 11
The People &c.,
          Respondent,
        v.
Anthony DiPippo,
          Appellant.


          Mark M. Baker, for appellant.
          David M. Bishop, for respondent.


STEIN, J.:

          On this appeal, defendant Anthony DiPippo argues that

the trial court abused its discretion by precluding him from

introducing evidence of third-party culpability during his

retrial for felony murder and rape in the first degree.  We

conclude that, under the circumstances of this case, defendant

- 1 -

should have been permitted to present evidence of third-party culpability to the jury.

I.

In 1994, a 12-year old girl (hereinafter the victim) went missing in Putnam County.  Tragically, her remains were found, over one year later, in a wooded area off a dirt road known to some locals as "mari[h]uana road."  Defendant and one of his friends, Andrew Krivak, were arrested in 1996 and charged with raping and murdering the victim on or about October 3, 1994. Following a jury trial, defendant was convicted of murder in the second degree and rape in the first degree, and he unsuccessfully exhausted his direct appeals (265 AD2d 340, 340 [2d Dept 1999], lv denied 94 NY2d 918 [2000]).

On one of defendant's subsequent CPL 440.10 motions, the Appellate Division vacated the judgment of conviction and sentence and remitted the matter for a new trial on the ground that defendant had been denied the effective assistance of trial counsel because his attorney had operated under a conflict of interest (82 AD3d 786, 787 [2d Dept 2011], lv denied 17 NY3d 903 [2011]).  More specifically, counsel had previously represented Howard Gombert, a possible suspect in the victim's rape and murder, on an earlier rape charge (see id. at 788-789).  The Appellate Division concluded that counsel's failure to disclose his prior representation of Gombert to defendant or the trial court, combined with counsel's failure to "conduct even a minimal

investigation" into Gombert's potential involvement in the crimes

for which defendant stood accused, demonstrated that the conflict

operated on counsel's representation of defendant (id. at 791).

Upon his retrial, defendant sought to admit evidence

suggesting that Gombert was the perpetrator of the crimes with

which defendant was charged.  Defendant made an offer of proof to

the court detailing the evidence that he claimed supported his

third-party culpability defense.  Foremost amongst this evidence

was the affidavit of Joseph Santoro, who was incarcerated with

Gombert in Connecticut[1] and claimed that Gombert had made

incriminating admissions in April 2011 with respect to his

involvement in the victim's death.

According to Santoro's affidavit, Gombert told him that

Putnam County authorities were "trying to get him for the killing

of two girls" in the Putnam County area.  Gombert named the

victim as one of the girls, asserting that, in any event, "they

already convicted some other suckers" in connection with her

death.  Santoro asked Gombert, "[s]o the other guys didn't do

it?" and, according to Santoro, Gombert laughed and responded

that "[e]ven if they didn't, they got no evidence against me.

It's been a long time since then."  Thereafter, Gombert made a

---

[1]  Gombert was incarcerated for crimes that included
attempted sexual assault of an eight-year-old girl and third-
degree sexual assault of one of his girlfriends (see State v
Gombert, 80 Conn App 477, 479, 836 A2d 437, 441 [Conn App Ct
2003]; Gombert v Warden, 2013 WL 4873470, *1 [Conn Super Ct Aug.
22, 2013]).

derogatory sexual comment about the victim, prompting Santoro to ask whether Gombert had sexual relations with her. Gombert explained to Santoro that he had met the victim at his former girlfriend's house, and was attracted to her. Gombert claimed that the victim "flirted with him a lot" and offered to babysit for Gombert's child, but Gombert declined the babysitting offer because he was with the child's mother at the time. According to Santoro, Gombert then stated that "[t]he only way he could get [the victim] into his car was to tell her he wanted her to babysit for his daughter" and that, after he did so, he had sex with the victim in a red car with a black hood. Santoro elicited from Gombert that this occurred at "the time [the victim] disappeared." When Santoro told Gombert that he would be better off keeping quiet, Gombert told him that "'[i]t don't matter now. They already got those other guys/suckers so I'm in the clear.'" Santoro also described sexual comments made by Gombert about the victim on a separate occasion, at which point Gombert told Santoro that the victim did not want to have sex with him, but he "had to persuade her." In addition, Gombert made statements regarding a second missing girl, identified by first name, who had indeed gone missing, and whose body he claimed would never be found by the police. Santoro interpreted Gombert's statements to him as boasts that Gombert had killed both girls, and that defendant and Krivak were wrongly prosecuted for killing the victim.

Defendant's proffer supplemented Santoro's affidavit with the statements of various witnesses establishing that Gombert knew the victim, having met her at his former girlfriend's house, where the victim often spent time with the former girlfriend and her children. Defendant also submitted statements establishing that the victim had discussed babysitting Gombert's child with Gombert and his then-girlfriend. Gombert's then-girlfriend and another witness also confirmed that Gombert had regular access to and routinely drove the girlfriend's car, which was red with a black hood and had Connecticut license plates. The girlfriend further informed police that, after they saw a missing person poster for the victim, Gombert told her that he had given the victim a ride in her car the previous week.

In addition, defendant proffered notes from a police officer indicating that a witness, Anita Albano, had seen the victim, on the last day that she was seen alive, getting into a compact red vehicle with Connecticut license plates, driven by a young man with whom the victim appeared to be familiar. When Albano viewed a photograph array, she stated that the person in picture number two, if anybody, looked like the driver; photograph number two depicted Gombert. Finally, defendant tendered what he termed "reverse Molineux" (People v Molineux, 168 NY 264, 273 [1901]) evidence, namely, allegations that Gombert had raped and sexually assaulted other girls and women in what he claimed was a similar manner to that which was alleged

with regard to the victim.

Initially, County Court denied defendant's motion to admit the third-party culpability evidence because it found that Albano had not identified Gombert as the driver of the vehicle she saw the victim enter on the day she disappeared, but the court later reopened the matter to hear testimony from Albano regarding her observations.  At that hearing, Albano testified that she had not identified Gombert, who was older than the person she saw, as the driver; rather, she claimed to have told the police officers that the driver was not depicted in the photographs but that Gombert, if anyone, bore some resemblance to the driver.  Albano further testified that, a few days before the hearing, she was shown a picture of the red vehicle belonging to Gombert's former-girlfriend, and that it was not the vehicle that she had seen on the day in question.  Two police officers corroborated aspects of this testimony.

In light of Albano's testimony and the absence of any direct evidence placing Gombert with the victim on the day she was last seen alive, County Court held that defendant had failed to present sufficient evidence pointing to Gombert as the perpetrator, and that Gombert's alleged statements to Santoro were inadmissible hearsay.  County Court thereafter denied defendant's request to reconsider its ruling.

At trial, the People presented evidence generally establishing that the victim was last seen alive on October 3,

1994.  A few witnesses testified that they saw the victim at a gas station that night, in the company of, among others, defendant and Krivak.  According to the prosecution's main witness, the victim, defendant, Krivak, the witness, and two other male friends were driving home from the gas station in Krivak's van when Krivak pulled off to the side of "mari[h]uana road."  The witness testified that two of the men were consuming drugs in the front seat, and that she and the others were drinking alcohol and smoking marihuana in the back when Krivak began grabbing at the victim, who resisted.  According to the witness, Krivak threw the victim to the floor of the van, pulled off her clothing, tied her hands with rope, shoved her underwear in her mouth, tied her bra around her face, and raped her.  A few minutes later, the witness asserted, defendant also raped the victim who, by the end, appeared "lifeless."  The witness testified that Krivak and defendant wrapped the victim in her clothes, picked her up, and left her somewhere outside the van.

      The witness admitted, however, that she did not disclose any of this information to the police the first two times she spoke to them, and it was not until two years after the alleged murder, when she received warnings from the police that she could be charged, that she implicated defendant and Krivak. Further, the witness's credibility was impeached by questions concerning her drug use that night and, more generally, around the time of the victim's disappearance, as well as by her

admission that she continued to associate with defendant after the alleged crimes were committed.

The victim's remains were found with rope tied around her wrists -- which were behind her back -- and looped around her neck and down to her ankle in a "hogtied" position. The victim did not appear to have been wearing clothing, and the deteriorated remains of her underwear were found balled up at the top of the skeleton's spine. A consultant with the medical examiner's office opined that the location of the underwear was consistent with it having been inside the victim's mouth, and testified that this could have caused asphyxiation. Several pieces of jewelry later identified as belonging to the victim were found in Krivak's van.

Defendant testified in his own defense and adamantly denied his guilt. Defendant also attempted to persuade the jury that the People's main witness was not credible given her initial denial of any knowledge of the crime. To that end, the two uncharged men who the People's main witness claimed were in the van when the victim was allegedly raped and killed testified that they were not present that evening and denied any knowledge of the crimes. Both of these witnesses admitted that they had each previously signed statements indicating that they were in the van when defendant and Krivak committed the crime, but they claimed to have made those statements only as a result of police coercion. Another friend of defendant testified that police

officers tried to persuade him to sign a statement indicating that he had seen the victim with defendant and Krivak that night, but he refused because it was not true.  Finally, one of the victim's school teachers testified that she saw the victim at the mall five days after she was allegedly killed by defendant and Krivak.

The jury found defendant guilty of felony murder and rape in the first degree, and defendant was sentenced to an aggregate prison term of 25 years to life.  On defendant's appeal, the Appellate Division affirmed (117 AD3d 1076 [2d Dept 2014]).  As relevant here, the Appellate Division held that the trial court had "providently exercised its discretion in denying [defendant's] motion to introduce the proffered [third-party culpability] evidence" (id. at 1076).  A Judge of this Court granted defendant leave to appeal (24 NY3d 1083 [2014]), and we now reverse.

II.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'" (Nevada v Jackson, ___ US ___, ___, 133 S Ct 1990, 1992 [2013], quoting Crane v Kentucky, 476 US 683, 690 [1986]; see Holmes v South Carolina, 547 US 319, 324 [2006]; People v Carroll, 95 NY2d 375, 385 [2000]).  Where a defendant seeks to pursue a defense of third-party culpability at trial, evidence offered in support of that defense is subject to "the general balancing analysis that

governs the admissibility of all evidence" (<u>People v Primo</u>, 96 NY2d 351, 356 [2001]).  Thus, a court must determine whether the evidence is relevant and, if so, whether "its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues or misleading the jury" (<u>id.</u> at 355; <u>see</u> <u>People v Negron</u>, 26 NY3d 262, 268 [2015]).  Further, "[t]he admission of evidence of third-party culpability may not rest on mere suspicion or surmise" (<u>Primo</u>, 96 NY2d at 357; <u>see</u> <u>Holmes</u>, 547 US at 327; <u>People v Schulz</u>, 4 NY3d 521, 529 [2005]). Generally, "[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved to show that someone other than the defendant committed the crime" (<u>Schulz</u>, 4 NY3d at 529 [internal quotation marks and citations omitted]).  Where, as here, the defendant makes an offer of proof to the court explaining the basis for a third-party culpability defense and connecting the third-party to the crime, and the probative value of the evidence "plainly outweighs the dangers of delay, prejudice and confusion," then it is "error as a matter of law" to preclude the defendant from presenting such proof to the jury (<u>Primo</u>, 96 NY2d at 357).

In <u>People v Primo</u>, we held that it was error to preclude third-party culpability evidence where a ballistics report linked the bullets recovered from the scene of the charged shooting to a gun used by a third party -- who was identified as being present at the time of the shooting -- in an unrelated

assault two months later (see id.).  In contrast, we have held
that speculative assertions that other unidentified individuals
had a motive to harm a victim are insufficient to support
admission of third-party culpability evidence (see People v King,
___ NY3d ___, ___ [decided herewith]; People v Gamble, 18 NY3d
386, 398 [2012]).  We have also upheld the preclusion of third-
party culpability evidence where the defendant proffers only
general evidence establishing that an identified third party has
committed the same type of crime in the same general area close
in time to the charged crime (see Schulz, 4 NY3d at 529).  Yet,
while we have held that proof connecting a third party to the
crime may establish the probative value of the proffered
evidence, we have never held that there must, in every case, be
proof directly linking the third party to the crime scene;
indeed, we have recently held that, in certain circumstances,
third-party culpability evidence may be admitted absent such
direct evidence (see Negron, 26 NY3d at 269).

Here, our evaluation of defendant's third-party
culpability proffer begins with Santoro's statement, which faces
a threshold evidentiary hurdle -- namely, the question of whether
Gombert's declarations are admissible under the hearsay exception
for declarations against penal interest.  A statement may be
admitted as a declaration against penal interest where: the
declarant is unavailable as a witness at trial; the declarant was
aware the statement was against his or her penal interest when it

was made; the declarant had competent knowledge of the facts underlying the statement; and "supporting circumstances independent of the statement itself . . . attest to its trustworthiness and reliability" (People v Settles, 46 NY2d 154, 167 [1978]; see People v Shabazz, 22 NY3d 896, 898 [2013]). There can be no serious dispute that the first three of these requirements are satisfied here.  It is undisputed that Gombert would have invoked his right against self-incrimination if he was called to the stand, he was certainly aware that his statements indicating that he had sexually assaulted the victim were against his penal interest, and he had competent knowledge of his own involvement in the victim's life and death.  It is the last of the required elements -- the reliability of the statement -- that raises a question.

With regard to that element, we have held that, "[t]o circumvent fabrication and insure the reliability of . . . statements [against penal interest], there must be some evidence, independent of the declaration itself, which fairly tends to support the facts asserted therein" (Settles, 46 NY2d at 168; see People v Shortridge, 65 NY2d 309, 313 [1985]).  When considering the reliability of a declaration, courts should also consider the circumstances of the statement, such as, among other things, the declarant's motive in making the statement -- i.e., whether the declarant exculpated a loved one or inculpated someone else, the declarant's personality and mental state, and

"the internal consistency and coherence of the declaration" (Shortridge, 65 NY2d at 313). Where, as here, the statement is offered by the defendant, this element is satisfied if the supportive evidence "establishes a reasonable possibility that the statement might be true" (Settles, 46 NY2d at 169-170; see Shabazz, 22 NY3d at 898). Furthermore, "[c]ircumstances of seeming indifference may still harmonize the declarant's statement so as to furnish the necessary link" (Settles, 46 NY2d at 169). Significantly, "[w]hether a court believes the statement to be true is irrelevant, and the question of admissibility is to be resolved without regard to the seeming strength or weakness of the People's case" (Settles, 46 NY2d at 170).

In this case, there is no obvious motive for Gombert to falsely implicate himself; rather, it was in his best interest to keep quiet about the supposed innocence of defendant and Krivak (compare Shortridge, 65 NY2d at 313). Nor is there any evidence that Gombert had a mental condition that would explain his unprompted statements alluding to his involvement in the victim's death. The statement itself was internally consistent and coherent, with no apparent contradictions. Most significantly, almost all of Gombert's claims, as recounted by Santoro, were corroborated by outside sources, including the fact that Gombert knew the victim, the circumstances under which he had met her, that they had discussed having her babysit for his child, that

Gombert had access to a vehicle generally matching the description of the car as given to Santoro, and that Gombert knew the other identified missing girl.[2]  Under these circumstances, the fourth element of the Settles test is satisfied.  Thus, had Santoro testified at trial, Gombert's statements to him would have been admissible.

In light of their admissibility, Gombert's declarations connected him to the crime and, when Santoro's proposed testimony is considered in combination with the additional proffered evidence, defendant's third-party culpability proffer was compelling and highly probative of the question of who killed the victim.  In particular, in addition to the corroboration of the individual facts in Santoro's affidavit by statements from outside witnesses, defendant's "reverse Molineux" evidence satisfied his burden regarding the proffer.

While unlikely to be sufficient standing alone, we have previously recognized that reverse Molineux evidence -- i.e., evidence that a third party has committed bad acts similar to those the defendant is charged with committing -- is relevant to, and can support, a third-party culpability proffer where the crimes reflect a "modus operandi" connecting the third party to

---

[2]  Almost all of these facts were provable without resort to hearsay and -- contrary to the dissent's suggestion -- the trial court did not find the form of defendant's offer of proof to be insufficient in determining that Gombert's admissions were unreliable.

the charged crimes (see Schulz, 4 NY3d at 528; see also People v
Bunge, 70 AD3d 710, 711 [2d Dept 2010]; United States v
Aboumoussallem, 726 F2d 906, 911 [2d Cir 1984]; State v Garfole,
76 NJ 445, 451, 388 A2d 587, 590 [1978] ["The same concept of
relevancy which justifies submission of other-crimes evidence by
the State supports it when proffered by the defendant"]).
Typically, in evaluating evidence of similar acts for the
presence of a modus operandi when such evidence is offered by the
People, we look to whether the "similarities were unusual enough
to compel the inference that the [same individual] committed
both.  Thus, the . . . *modus operandi* must be sufficiently unique
to make the evidence of the uncharged crimes 'probative of the
fact that [the individual] committed the one charged'" (People v
Beam, 57 NY2d 241, 251 [1982], quoting People v Condon, 26 NY2d
139, 144 [1970]; see People v Mateo, 93 NY2d 327, 332 [1999];
People v Allweiss, 48 NY2d 40, 47 [1979]).  Although defendant
urges us to adopt a more relaxed standard for such proof when it
is offered on behalf of the defense (see e.g. Aboumoussallem, 726
F2d at 911-912; United States v Stevens, 935 F2d 1380, 1404 [3d
Cir 1991]; State v Scheidell, 227 Wis 2d 285, 304, 595 NW2d 661,
671 [1999]), we have no need to do so here because defendant's
proof meets the ordinary standard for evaluating such evidence.

Specifically, defendant's written proffer tended to
demonstrate that at least two other victims of sexual assaults by
Gombert -- both of whom, like the victim here, were known to

Gombert prior to the assaults and were children at the relevant
times -- alleged that Gombert had sexually assaulted them, on
some occasions in the woods, while restraining their hands (in at
least one instance with a rope in a "hogtied" fashion), and
shoved articles of clothing in their mouths.  Taken together,
these characteristics of the alleged rapes and, in particular,
the shoving of the clothing in the victims' mouths -- which is
consistent with the state of the victim's body when it was found
and the prosecution's theory of the potential cause of her death
-- are sufficiently unique for those bad acts to qualify as modus
operandi evidence connecting Gombert to the victim's death (see
Allweiss, 48 NY2d at 48).[3]  Thus, to the extent defendant has
proffered allegations of sexual assault against other victims
containing this combination of characteristics, the reverse
Molineux evidence supports his third-party culpability proffer.

    Viewed in its totality, if proven through appropriate
witness testimony at trial, defendant's proffer demonstrated
that: Gombert knew and had access to the victim; he was familiar

---

[3]  While defendant did not present this proof to the court
through affidavits of the other alleged victims, we note that the
court did not request that he do so and, while that may have been
preferable, we do not find this omission to be fatal to his
proffer.  Further, defendant offered to have his defense
investigator testify to the victims' statements in support of his
proffer.  Defense counsel has acknowledged that, if he had been
permitted to offer the third-party culpability evidence at trial,
it would have been necessary to have offered the testimony of the
appropriate witnesses, themselves, so as to avoid any hearsay
problems.

with the road near which the victim's remains were found; he had a history of allegedly assaulting other young girls with whom he was familiar in a manner uniquely similar to the prosecution's theory of how the victim was killed; and that Gombert allegedly made statements indicating that he had sexually abused the victim around the time of her disappearance and that defendant and Krivak were prosecuted for crimes that he had committed. As in Primo, this evidence was sufficiently probative to be admissible (see 96 NY2d at 357). Contrary to County Court's determination and the dissent's position, defendant's inability to place Gombert with the victim on the day, or at the precise location, of her disappearance does not eviscerate the probative value of defendant's third-party culpability evidence or render it speculative (cf. Negron, 26 NY3d at 269). Such evidence would undoubtedly strengthen any proffer. However, the strength of the evidence necessary to establish the admissibility of proof relating to a third party's culpability will depend, among other things, on the nature of the crime. Here, inasmuch as the exact time and place of the crime are subject to dispute given the circumstances of the victim's disappearance and the lengthy period of time that elapsed before her body was discovered -- which explains the absence of direct proof in defendant's proffer tying Gombert to the crime scene -- Gombert's declarations against penal interest are sufficiently probative. Thus, although a jury would be free to discredit Santoro's account of

Gombert's admissions and defendant's theory that Gombert was actually the perpetrator, it was error to preclude him from presenting the evidence in question because "its probative value plainly outweigh[ed] the dangers of delay, prejudice and confusion" (Primo, 96 NY2d at 357; cf. Negron, 26 NY3d at 269; compare King, ___ NY3d at ___; Gamble, 18 NY3d at 398; Schulz, 4 NY3d at 528).

In so holding, we do not alter the rules of admissibility for third-party culpability evidence. The facts as presented in Primo do not, as the dissent implies, constitute the minimum proof required for the admission of evidence of third-party culpability. It is true that the defendant in Primo was able to connect the gun used in commission of the charged shooting to a third party, who the shooting victim placed at the scene (see 96 NY2d at 357). Tellingly, however, we have no victim in this case who can identify those present at the time of death, and the instrument of the victim's death cannot be connected to *either* defendant or Gombert. This case is, therefore, plainly distinguishable from Primo and, understandably, the type of third-party culpability proof available to defendant here is different; nevertheless, it does not lack in probative value or fail to establish Gombert's connection to the crime.

Nor is our holding contrary to our ruling in People v Schulz, where we determined that the trial court properly

precluded evidence of third-party culpability (4 NY3d at 528).

At his trial for robbery in that case, the defendant sought to

admit a photograph of a third party who had committed several

robberies in the same general area before and after the robbery

for which the defendant was charged, and who allegedly bore a

resemblance to the defendant.  We upheld the court's preclusion

of third-party culpability evidence in Schulz because nothing in

the defendant's proffer "show[ed] a modus operandi, a witness who

saw [the third party] at the scene[,] or even a connection

between the getaway car and [the third party]" (id. at 528).  Put

simply, the third-party proffer there consisted of nothing more

than the fact that the third party had committed other crimes of

the same general type, but not necessarily sharing particularly

similar or unique features.  By contrast, here, as we explained,

defendant has offered evidence of a unique modus operandi that

potentially connects Gombert to the crime, and the statements

Gombert allegedly made to Santoro -- as well as other proof --

connect him to the victim at the approximate time of her

disappearance.  Thus, defendant's third-party proffer

sufficiently supplied the key elements that we found lacking in

Schulz.  The trial court should have permitted defendant to

submit admissible proof at trial to support his third-party

culpability defense.

     Although the evidence presented by the People was

arguably overwhelming, we cannot say, on these facts, that the

error in curtailing defendant's ability to present a complete defense through the introduction of third-party culpability evidence was harmless (see People v Osorio, 75 NY2d 80, 87 [1989]; People v Crimmins, 36 NY2d 230, 242-243 [1975]). Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

People v Anthony DiPippo

No. 11

FAHEY, J. (dissenting):

For the first time, we are allowing a theory of third-party culpability to go forward based on an offer of proof consisting entirely of hearsay. Defendant's offer of proof fell far short of that presented in People v Primo (96 NY2d 351 [2001]), the only case before today in which this Court has held that a trial court abused its discretion as a matter of law in precluding such evidence. This decision imposes an undue restraint upon the discretion of trial courts to weigh the probative versus prejudicial value of third-party culpability evidence and make a reasoned decision regarding its admissibility. I respectfully dissent.

Howard Gombert's alleged statement to Joseph Santoro was required to surmount a threshold evidentiary hurdle by satisfying the four-pronged test of the hearsay exception for declarations against penal interest. The first three elements of that test were met. I disagree with the majority, however, that Gombert's alleged statements to Santoro satisfied the final prong -- that defendant presented "supporting circumstances independent of the statement itself . . . to attest to its trustworthiness

- 1 -

and reliability" (People v Settles, 46 NY2d 154, 167 [1978]).
Even under the more lenient standard applied when a defendant
seeks to introduce a declaration against interest as exculpatory
evidence (see People v Soto, 26 NY3d 455, 462 [2015]), the fourth
factor of the test, which is "the most important aspect of the
exception" (People v Shabazz, 22 NY3d 896, 897 [2013] [internal
quotation marks omitted]), was not met.

Defendant's proffered evidence of third-party
culpability fell into four categories.  First, defendant sought
to introduce Gombert's alleged statements to Santoro.  Second,
defendant sought to introduce other evidence allegedly connecting
Gombert to the crime, which consisted of the statements of Anita
Albano and Gombert's former girlfriend.  Gombert's former
girlfriend told police that shortly after the victim's
disappearance, Gombert told her that he had given the victim a
ride to some unspecified place on some unspecified day around the
time that the victim went missing.  Gombert did not tell her that
he had committed a crime or that he was involved in the victim's
disappearance.  Further, although Albano testified at the
pretrial hearing, her testimony did not inculpate Gombert,
inasmuch as she testified that the red car she saw the victim
enter on the day of her disappearance was not the car of
Gombert's former girlfriend, and that Gombert was not the young
man whom Albano saw driving the red car.  Third, defendant
offered statements from certain witnesses who told police that

Gombert knew the victim and that the victim had offered to babysit for Gombert.  Finally, defendant sought to introduce "reverse Molinuex" evidence regarding Gombert's history of sexual assaults.

Every piece of evidence that defendant presented in an attempt to demonstrate the reliability of Gombert's statements to Santoro was hearsay.  Gombert's statement to his former girlfriend that he had given the victim a ride was hearsay, as was his former girlfriend's statement to police itself.  Statements from witnesses asserting that Gombert knew the victim and that she had offered to babysit were hearsay.  The proffered "reverse Molineux" evidence was also hearsay.  Defendant offered that proof through a defense investigator, an obviously interested party.  Defendant did not offer any statements, sworn or unsworn, from Gombert's victims themselves.

To be clear, I am not suggesting that a defendant seeking to introduce evidence of third-party culpability must present all evidence in support of that application in admissible form at the pretrial stage.  Here, nothing was in admissible form, except for the testimony of Albano, which did not support defendant's application.

The quality of the proof the defendant offers must be considered in evaluating whether the trial court abused its discretion as a matter of law in precluding the evidence.  Defendant did not submit an affidavit from Gombert's former

girlfriend, or any of the witnesses who defendant asserted could establish Gombert's relationship with the victim. Defendant did not present an affidavit from any of Gombert's victims to support his reverse Molinuex application, and he further failed to present an affidavit from the defense investigator who allegedly interviewed these victims. In short, defendant asked the trial court to admit Gombert's statement to Santoro not based upon "sufficient competent evidence independent of the [statement itself] to assure its trustworthiness and reliability" (People v Brensic, 70 NY2d 9, 15 [1987]), but rather based upon questionable hearsay.

Defendant has acknowledged that he will be required to offer the live testimony of Gombert's victims and any other appropriate witnesses upon retrial. In his pretrial application, however, defendant did not indicate that any of these witnesses were willing to testify at trial. Faced with the unreliable and speculative nature of the evidence defendant offered in an attempt to support the trustworthiness of Gombert's statement to Santoro, the trial court did not abuse its discretion as a matter of law in concluding that defendant failed to satisfy the fourth prong of the Settles test (see Settles, 46 NY2d at 167).

Even assuming Gombert's alleged statements to Santoro qualified as a declaration against penal interest, I nevertheless cannot conclude that the trial court abused its discretion as a matter of law in precluding evidence of third-party culpability.

        In Primo, we rejected the "clear link" standard for
admissibility of third-party culpability evidence that had been
employed by the Appellate Division, which generally required the
defendant to show a "clear link" between the third party and the
crime in question, in favor of a test "described in terms of
conventional evidentiary principles" (see Primo, 96 NY2d at 354-
355).  Under that test, the trial court should conduct a
discretionary balancing of the probative value of the evidence
against its potential for "trial delay, undue prejudice to the
opposing party, confusing the issues or misleading the jury" (id.
at 355).  We noted that, "[t]o the extent that the 'clear link'
standard implies no more than an abbreviation for the
conventional balancing test, it presents no problem" (id. at
356).

        Even under the proper test, however, "remote evidence
of a third party's culpability -- though relevant -- will not be
sufficiently probative to outweigh the risk of trial delay, undue
prejudice or jury confusion" (id. at 356).  We cautioned in Primo
that, in the context of third-party culpability evidence, the
"risks of delay, prejudice and confusion are particularly acute,"
and that if these risks are not "weighed against the probative
value of the evidence, the fact-finding process would break down
under a mass of speculation and conjecture" (id. at 356-357).
For these reasons, "[t]he admission of evidence of third-party
culpability may not rest on mere suspicion or surmise" (id. at

357).

The evidence of third-party culpability defendant offered here was far weaker than the evidence offered by the defendant in Primo.  There, the shooting victim acknowledged that the third party was at the crime scene at the time of the shooting.  Significantly, a ballistics report linked the bullets recovered from the crime scene to a gun used by the third party two months later in an unrelated crime (see Primo, 96 NY2d at 353-354).  We concluded that the probative value of the ballistics report, "coupled with proof that [the third party] was at the scene of the shooting, . . . plainly outweigh[ed] the dangers of delay, prejudice and confusion" (id. at 357).  We therefore held that the trial court improperly precluded the ballistics report as evidence of third-party culpability (see id.).

Here, by contrast, there is no physical evidence connecting Gombert to the crime, and no witness placing Gombert with the victim on the day of her disappearance, let alone at the crime scene.  The reverse Molineux evidence presented by defendant, although it points to Gombert as a heinous individual, does not persuade me that the trial court abused its discretion as a matter of law.  Defendant's investigator allegedly spoke to several of Gombert's victims, and they told the investigator that Gombert only sometimes restrained their hands behind their backs or shoved articles of clothing in their mouths during his sexual

assaults (cf. People v Beam, 57 NY2d 241, 252 [1982] ["Although
there are minor differences in each attack, the pattern of the
initial encounter and the specifics of the sexual attacks, all of
which followed the same pattern, indicate a unique *modus
operandi*"]).

This Court has generally left the resolution of issues
surrounding third-party culpability to the discretion of the
trial court, unless the evidence of third-party culpability was
so unmistakably strong that it was an abuse of discretion for the
trial court not to allow the jury to hear it (see Primo, 96 NY2d
at 357). Where the defendant's proffer has fallen short of the
strong proof of third-party culpability presented in Primo, this
Court has not interfered with the discretionary determination of
the trial court (see People v King, -- NY3d -- [decided
herewith]; People v Gamble, 18 NY3d 386, 398-399 [2012], rearg
denied 19 NY3d 833 [2012]; People v Schulz, 4 NY3d 521, 529
[2005]). This Court should not interfere in those discretionary
determinations unless the evidence, like that presented in Primo,
is so compelling that the trial court clearly abused its
discretion as a matter of law in precluding it. I conclude that
the evidence offered by defendant here does not rise to that
level.

Although defendant will finally be required to present
proof of third-party culpability in admissible form at a new
trial, the trial court must otherwise exercise its discretion to

ensure that "the fact-finding process [does not] break down under a mass of speculation and conjecture" (Primo, 96 NY2d at 357). The determination of admissibility can only be answered at trial. The trial court should be allowed to exercise its discretion upon retrial with respect to these issues.  Faced with the prospect of another appellate reversal, however, the trial court here, and other trial courts attempting to comply with the Court's ruling in the future, will be reluctant to do so.

Defendant's remaining contentions are without merit.  I would affirm the order of the Appellate Division.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed and a new trial ordered.  Opinion by Judge Stein. Judges Pigott, Rivera and Abdus-Salaam concur.  Judge Fahey dissents in an opinion.  Chief Judge DiFiore and Judge Garcia took no part.

Decided March 29, 2016