People v Montgomery (2018 NY Slip Op 00351)





People v Montgomery


2018 NY Slip Op 00351


Decided on January 18, 2018


Appellate Division, First Department


Acosta, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 18, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta, P.J.
Sallie Manzanet-Daniels
Judith J. Gische
Barbara R. Kapnick
Marcy L. Kahn,JJ.


3582/09 4863 

[*1]The People of the State of New York, Respondent,
v
Gentry Montgomery, Defendant-Appellant.



Defendant appeals from the judgment of the Supreme Court, New York County (A. Kirke Bartley, Jr., J.), rendered May 24, 2012, convicting him, after a jury trial, of robbery in the first degree and attempted robbery in the first degree, and imposing sentence.




Robert S. Dean, Center for Appellate Litigation, New York (Mark W. Zeno of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Susan Axelrod and Alan Gadlin of counsel), for respondent.



ACOSTA, P.J.


At issue in this case is whether defendant was deprived of due process and the right to present a defense when the trial court precluded him from presenting reverse Molineux evidence showing that another person had committed three uncharged robberies similar to the four robberies for which defendant was indicted. Indeed, the prosecutor relied on the theory that defendant was responsible for all four robberies in opposing defendant's request for separate trials, but later argued that there was insufficient evidence to link defendant to the unindicted robberies in opposing defendant's reverse Molineux request. The court also denied defendant's request to introduce his arrest fingerprint card, which defendant argues did not show that he had a scar on the palm of his hand, in contrast to a trial witness's description of her assailant. We find that these ruling were erroneous and, in combination, denied defendant a fair trial.
Factual Background
Pretrial suppression hearing evidence, including surveillance video, established seven [*2]robberies as part of a pattern committed by the same man: 1. Park View Café on June 2, 2009, at 6:30 a.m.; 2. Twin Donuts on June 8, 2009 at 6:30 p.m.; 3. Mi Pueblo Mexican Grocery on June 8 at 9:40 p.m.; 4. Starbucks on June 8 at 11:00 p.m.; 5. Sanaa Deli1 on June 8 at 11:55 p.m.; 6. United Fried Chicken and Pizza [UFC] on June 9, 2009 at 12:35 a.m.; and 7. Seven Seas Deli on June 9 at 3:50 a.m.
Each complainant in the June 8 and 9 robberies described the perpetrator as a heavyset, bald black male, about five feet, seven inches, to five feet, nine inches, tall, with a goatee and wearing a New York Yankees shirt. Defendant was identified as a suspect in each robbery following his arrest on street-level drug charges, because he resembled the man in the surveillance video of one of the robberies.
Witnesses to three of the robberies did not identify defendant as the perpetrator. The UFC witness identified a lineup filler, and the Park View Café and Twin Donut witnesses did not recognize anyone in the lineup as the man who had robbed them.
The prosecutor obtained an indictment against defendant on the four robberies in which he had been identified: first-degree robbery at Mi Pueblo and Seven Seas, and attempted first degree robbery at Starbucks and Sanaa.
Defendant moved to sever the counts for trial on the grounds that he would be unduly prejudiced if all four robberies were tried together, because there was "a substantial likelihood" that, if the jury believed he committed one or more of the robberies, it would "bootstrap the evidence in those offenses . . . to convict him of the other crimes."
The People argued that a joint trial of all four counts was appropriate because proof of each robbery would be material proof of the others. They contended that each offense was part of a "pattern robbery" and that proof of each "would be relevant at a trial of the other robberies or attempted robberies to help prove the defendant's identity." The court denied the motion.
At the first trial, the People were unable to produce a witness from the Sanaa Deli robbery, and that count was dismissed. The jury deliberated over the course of three days, repeatedly announcing that it was unable to reach a unanimous verdict. Ultimately, the court declared a mistrial.
Before the retrial, the prosecution stated that it was dropping another of the robberies from its case and would be proceeding to trial on only two of the seven robberies, the Mi Puebla and Starbucks incidents.
Defense counsel repeatedly asked the court for permission to introduce reverse Molineux evidence. He sought to show that defendant had not committed the Starbucks and Mi Puebla robberies by showing that he had not committed one or more of the other five robberies. Among other things, counsel sought to introduce surveillance video from three of the robberies not on trial to show that the same perpetrator who committed those robberies, as seen on the videos did not match defendant's description.
Counsel also sought to introduce what he called "negative identification" evidence. Eyewitnesses to five of the seven robberies, who were unavailable at trial, "could not identify defendant from the PhotoManager System, photo arrays and/or lineups," and one witness who had testified at the first trial "recanted his prior identification." Counsel also asked for disclosure of evidence of the other robberies on Brady grounds (Brady v Maryland, 373 US 83 [1963]).
The prosecutor opposed, arguing that evidence tending to establish that a defendant did not commit an uncharged crime was irrelevant to prove that he did not commit the charged crime.
The court denied the application in its entirety. The court concluded that there was "no proof the same person was responsible for all of the robberies for which the defendant was placed in lineups other than police speculation of an alleged pattern based upon similarity or descriptions." There was nothing "particularly unique or sufficiently similar to the crimes at [*3]issue here to support the inference that the same man was responsible for all" of the crimes. That witnesses in the uncharged crimes had not identified defendant was irrelevant to whether he had committed the robberies for which he was on trial.
The court also denied counsel's request for the disclosure of the names and contact information of the persons who had not identified defendant. It said that the names were not Brady material, because they were "not the subject of this trial."
The Second Trial
On the evening of June 8, 2009, Anayeli Lezama, her sister, and her father were working at her uncle's grocery store, Mi Pueblo Mexicana, at 2109 First Avenue between 108th and 109th Streets. At about 9:40 p.m., a man came in and went directly to the cash register. There were no customers in the store. Lezama, who had been sitting behind the counter talking on the phone, got up and walked over to the man. In the well lit store, Lezama observed that the man was a black man in his 40s, about five feet, seven inches, tall, with a "chubby" build, with some stubble around his mouth as if he had not shaved for a few days, wearing a navy blue Yankees "practice jersey."
Lezama asked how she could help him. The man told her in a low voice to give him all the money, adding, "I have a gun. If not I will shoot you." Lezama saw that the man's hand was under his shirt and that he had "like a bulk down there." She immediately opened the register and gave the man all of the $1 bills. Lezama testified that, when she handed the robber the cash, he took it from her with his left hand, with his palm facing up. She noticed there was a small circular white mark on the palm that looked like dry or dead skin. Because the robber had a dark complexion, it was noticeable on his palm. The robber took the bills, and demanded, "Give me all the money." Lezama told him, "[T]hat is all the money I have." The robber then left the store.
During the robbery, Lezama's sister had been seated on a stool opposite the cash register and could not see the robber's face. Lezama's father had been in the middle of the store and also had not seen her interaction with the robber. After the robber left, Lezama told them what had happened and called 911. The police arrived within moments. Lezama drove around the area with the officers but did not find the robber. The officers also showed her photographs at the precinct, but she did not see the robber.
At 11:00 p.m. on the same night, Virgin Marie Hernandez was the supervisor at Starbucks on 125th Street and Lenox Avenue, working with Duccu, her barista. She was about to close up when a man entered the store. The man was a little taller than Hernandez, who was five feet, three inches, tall, chubby and bald, with slight facial hair around his mouth. He approached the counter and faced Hernandez; part of his body and his face were captured on the video footage. Hernandez asked what she could get for him. He whispered something that Hernandez did not understand. She again asked, "What [] can I get for you?" The man answered, "[G]ive me everything in your draw[er]s." Hernandez was so frightened that she froze and stared at the man for several seconds. The man gestured downward with his hand inside his pocket; Hernandez believed that he was pointing a gun at her.
Duccu walked over to see what was going on. Hernandez told him that the man was trying to rob them. The man said, "Don't move," to both of them as he continued pointing "something" at Hernandez in a "threatening" manner. Hernandez explained that in order to unlock the register to give him the money, she needed the keys to the register. The man allowed her to go but ordered Duccu to stay where he was. Duccu pretended to wipe the counter and, turning toward Hernandez, told her to take the keys and run down to the basement. As he suggested, Hernandez ran downstairs. There, she watched the surveillance television, saw another customer walk into the store, and then saw the customer, the robber and Duccu walk out. After they left, she went back upstairs and called the police. Police officers arrived, and took her [*4]to the precinct to speak to the detectives. She looked at photographs but did not see the robber's picture.
On June 10, 2009, Detective Michael McCready was assigned to investigate the robberies. Other detectives had already obtained the Starbucks surveillance tape and pulled several still photographs from it, which McCready used in a "Wanted Poster" that he created. On June 11th, McCready received two photographs of defendant that had been taken on June 9th. Given the similarity of his appearance in those photographs to the appearance of the robber in the Starbucks video, McCready considered defendant a "person of interest." On June 18th, McCready arranged for defendant to be placed in lineups to be viewed separately by Hernandez and Lezama.
Lezama identified defendant as the man who had robbed her. When Hernandez viewed the lineup, she focused on number 5 (defendant). However, number 5 had more facial hair than the robber had had, and the lighting in the lineup room was not as bright as at Starbucks, so she initially said that she did not recognize anyone. When the detective asked again, she said that she recognized number 5 but he "look[ed] darker." She did not mean that his skin color looked darker; she meant that looking at defendant through the glass made him look darker than he had looked in the store.
Following the lineups, Detective McCready arrested defendant. Looking at defendant's hands, McCready noticed "a brown spot around the thumb area, and some white area around the end of the finger" on the palm right beneath the four fingers of his left hand that looked like a callus.
Detective Edward Sanabria, an expert latent print examiner with the New York City Police Department, received two latent fingerprints for examination, which he testified were taken from the 125th Street Starbucks. After examining them, Sanabria concluded that only one was "of value," and determined that it did not match defendant's prints.
Defense counsel attempted to introduce the left-hand palm print from defendant's fingerprint card to demonstrate that it was unblemished and therefore in conflict with Lezama's description of the robber's left palm. Sanabria testified that finger and palm prints can be affected by cuts, wounds, blisters, and even dry hands. He said that if he encountered a situation where the quality of the prints was affected by dry hands, he would note that on the fingerprint document.
When defense counsel asked that defendant's fingerprint card be marked for identification so that it could be shown to the witness, the prosecutor objected on hearsay and, later, foundation grounds, because it was not a document that Sanabria had prepared, only one that the he had relied upon. Defense counsel explained that the prints were relevant because Lezama had testified that the robber had a mark on his hand, and Sanabria had used defendant's prints for examination purposes. The court concluded that defense counsel did not have the foundation to admit the prints, because Sanabria was not the proper witness for introducing them.
At trial, both Lezama and Hernandez identified defendant as the robber. Hernandez testified that at the time of trial, defendant had more facial hair than he had had at the time of the robbery.
Analysis
Unindicted Robberies
Evidence that a defendant did not commit an uncharged robbery alleged to be part of a pattern of robberies is admissible when proof that the robberies were committed by the same person is strong enough that the evidence of defendant's innocence of the uncharged robbery would cast doubt on his guilt of the charged robberies (People v DiPippo, 27 NY3d 127, 135-136 [2016]; People v Wright, 270 AD2d 213, 214 [1st Dept 2000]). As the Court noted in DiPippo,
"Where a defendant seeks to pursue a defense of third-party culpability at trial, evidence [*5]offered in support of that defense is subject to the general balancing analysis that governs the admissibility of all evidence' (People v Primo, 96 NY2d 351, 356 [2001]). Thus, a court must determine whether the evidence is relevant and, if so, whether its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues or misleading the jury' (id. at 355; see People v Negron, 26 NY3d 262, 268 [2015]). Further, [t]he admission of evidence of third-party culpability may not rest on mere suspicion or surmise' (Primo, 96 NY2d at 357; see Holmes v South Crolina, 547 US 319, 327 [2006]; People v Schulz, 4 NY3d 521, 529 [2005])" (27 NY3d at 135-136).
As relevant to this case, the Court also stated that it had
"previously recognized that reverse Molineux evidence—i.e., evidence that a third party has committed bad acts similar to those the defendant is charged with committing — is relevant to, and can support, a third-party culpability proffer where the crimes reflect a modus operandi' connecting the third party to the charged crimes. . . Typically, in evaluating evidence of similar acts for the presence of a modus operandi when such evidence is offered by the People, we look to whether the similarities were unusual enough to compel the inference that the [same individual] committed both. Thus, the . . . modus operandi must be sufficiently unique to make the evidence of the uncharged crimes "probative of the fact that [the individual] committed the one charged."' Although defendant urges us to adopt a more relaxed standard for such proof when it is offered on behalf of the defense (see e.g. United States v Aboumoussallem, 726 F2d 906, 911-912 [2d Cir 1984]; United States v Stevens, 935 F2d 1380, 1404 [3d Cir 1991]; State v Scheidell, 227 Wis 2d 285, 304, 595 NW2d 661, 671 [1999]), we have no need to do so here because defendant's proof meets the ordinary standard for evaluating such evidence [that is, where the crimes reflect a modus operandi' connecting the third party to the charged crimes])" (id. at 138-139]).
Here, the facts of the unindicted robberies reflect a "modus operandi" connecting a third party to the charged crimes. Specifically, there is strong evidence that the same person committed at least the six robberies that occurred on June 8 and 9. Every witness gave a similar description of the robber: a bald black male, somewhere in his mid-40s, about five feet, nine inches, tall, weighing approximately 200 pounds, and wearing a blue Yankees t-shirt. Every witness gave a similar description of the robber's modus operandi: he entered the store, approached the counter, suggested he had a gun, which he never displayed, and demanded cash from the register. The robberies all occurred in close geographic and temporal proximity, and they all occurred on the evening of June 8 or the early morning of June 9, with the exception of the Park View Café robbery, which had occurred a week earlier, on June 2. Moreover, surveillance video from four of the robberies removed all doubt — the man described by the witnesses, wearing a distinctive Yankees shirt, is seen committing four of the robberies on the same night, two of them never charged.[FN1]
Given defendant's right to use reverse Molineux evidence, defense counsel sought to introduce two categories of evidence. First, counsel wanted to introduce the surveillance videos from the three robberies for which defendant was not on trial to show that he was not depicted in them: the jury was entitled to make its own assessment that the person sitting before them in the courtroom did not match the person shown in the three videos. There was no evidentiary rule that would have excluded the surveillance videos.
Second, defense counsel sought to introduce evidence that three witnesses from uncharged robberies had viewed lineups in which defendant participated, but had not identified him as the man who had robbed them. Had defense counsel presented the failure-to-identify testimony directly through each eyewitness, no evidentiary bar could have been raised: each eyewitness would have been qualified to say that he or she had viewed defendant in a lineup and that defendant was not the man who had robbed him or her. Had defense counsel been unable to find each of the eyewitnesses, or been otherwise unavailable to testify, and had instead sought only to introduce one or more of the failures to identify through the detective who had supervised the lineup, the detective's testimony would have been hearsay. Counsel could have overcome the hearsay objection by showing that the identifications were admissible on constitutional grounds because they were reliable (see People v Benjamin, 272 AD2d 276, 277 [1st Dept 2000], lv denied 95 NY2d 904 [2000]). Because the court precluded admission of the failure-to-identify testimony on relevance grounds, counsel did not have a full opportunity to demonstrate the reliability of the testimony.
Since the prosecutor was permitted to use surveillance video and eyewitness testimony from one robbery to prove that defendant had committed another, to satisfy due process, defendant must be permitted to use such evidence to prove that he did not commit the other robberies. Fingerprint Card
The court also erred when it prevented defendant from admitting his fingerprint card. An adequate foundation is established if a police department fingerprint expert states that the card has been delivered to him from the department's files and that prints on the card have not been altered (People v Basciano, 109 AD2d 945, 946 [3d Dept 1985]).
Here, NYPD latent print examiner Sanabria laid an adequate foundation to admit defendant's fingerprint card. Sanabria testified that he was provided defendant's prints at the examination office, including a full set of his finger and palm prints. The paperwork he was given with defendant's prints stated that the prints had been obtained on June 9, 2009, the day of defendant's arrest on unrelated narcotics charges. Sanabria's testimony that he had received defendant's fingerprint card in the normal course of his business, and that he had relied on it in making his examination assessment was adequate to establish its authenticity and unchanged condition (People v Basciano, 109 AD2d 945). Indeed, there was no allegation that the fingerprint card was ever out of police control, nor was there any hint that the fingerprint card had been tampered with or otherwise changed (see People v Quinones, 191 AD2d 398, 399-400 [1st Dept 1993], lv denied 82 NY2d 708 [1993]).
Counsel should have been permitted to introduce the fingerprint card and explore with [*6]Sanabria whether the left-palm print showed the markings that Lezama had described on the robber's left palm. Any weakness in the foundation went to the weight of the fingerprint evidence, not its admissibility (People v Pacheco, 274 AD2d 746 [3d Dept 2000], lv denied 95 NY2d 937 [2000]; People v Guzman, 272 AD2d 883 [4th Dept 2000], lv denied 95 NY2d 866 [2000]).
Nor was the cumulative effect of these errors (reverse Molineux and fingerprint card) harmless. The fingerprint card could have gone a long way to support defendant's theory by showing that a unique characteristic of the perpetrator was missing from defendant's palm. Defendant was arrested on an unrelated crime shortly after the Starbucks and Mi Puebla robberies. Any scars on his palm may have been depicted on his palm print.
Moreover, other than the two eyewitness identifications and the Starbucks surveillance video, nothing connected defendant to the robberies: there was no fingerprint - or DNA - evidence recovered, defendant was not arrested in proximity to the crime scene, and, when his apartment was searched, nothing was found that connected him to the robberies; the police did not find the distinctive Yankees shirt he was alleged to have worn during the robberies. In addition, both eyewitness identifications were cross-racial (see People v Boone ___ NY3d ___, 2017 Slip Op 08713 [Dec 14, 2017]).
Eyewitnesses to three robberies — United Fried Chicken, Park View Café, and Twin Donuts — did not identify defendant in the lineup. The Seven Seas Deli robbery witness did not recognize defendant's photo when it was shown to him only days after the robbery in an array. Although he had identified defendant in the subsequent lineup, he did not identify him in court at the first trial, and expressed doubts about his prior identification, first admitting that he was less than sure that defendant was the man who had rob him, because "sometimes people look alike," and that after the lineup he "felt" unsure about the identification he had made, but then insisting that he hd identified the right man. Although the Sanaa Deli robbery witness identified defendant in the lineup, the witness never appeared in court to testify.
That the evidence was not overwhelming was confirmed by the fact that a prior jury that heard the same evidence as well as the testimony of a third eyewitness who had identified defendant in a lineup was unable to reach a verdict (see e.g. People v Bell, 191 AD2d 361 [1st Dept 1993]).
In any event, there is a reasonable possibility that the erroneously precluded evidence would have affected the verdict. Since the prosecutor had bootstrapped its identification testimony, repeatedly telling the jury that two eyewitnesses from two separate robberies had identified defendant as the man who had robbed them, evidence that defendant's fingerprint card did not support Lezama's account and evidence that three other eyewitnesses had not identified defendant would have been a credible defense.
Accordingly, the judgment of the Supreme Court, New York County (A. Kirke Bartley, Jr., J.), rendered May 24, 2012, convicting defendant, after a jury trial, of robbery in the first [*7]degree and attempted robbery in the first degree, and sentencing him, as a second felony offender, to an aggregate term of 12 years, should be reversed, and a new trial ordered.
All Concur.
Judgment, Supreme Court, New York County (A. Kirke Bartley, Jr., J.), rendered May 24, 2012, reversed, and a new trial ordered.
Opinion by Acosta, P.J. All concur.
Acosta, P.J., Manzanet-Daniels, Gische, Kapnick, Kahn, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JANUARY 18, 2018
CLERK



Footnotes

Footnote 1:The court excluded the evidence of the other robberies on relevance grounds, a legal determination, i.e., it ruled that there was no "no proof the same person was responsible for all of the robberies," and never reached the question whether, in exercise of its discretion, it would have limited the evidence of the other robberies (People v Negron, 26 NY3d 262, 269 [2015] [where court justified exclusion of evidence on relevance grounds and not because probative value outweighed potential for undue prejudice or jury confusion, reversal required if a finding that evidence would have been admissible was "permissible" after appropriate balancing]; see also People v Cronin, 60 NY2d 430 [1983] [a trial court also errs when it wrongly perceives that it has no discretion to exercise]).